**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUN _ 1 2005 WH
JUN 1 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 03 CR 1004 |
| v. | ) | |
| | ) | Judge Blanche M. Manning |
| JAYNE NGATIA | ) | |

## NOTICE OF FILING

TO: Dan Hesler
Federal Defender Program
55 East Monroe Street
Suite 2800
Chicago, IL 60603
(312) 621-8300

PLEASE TAKE NOTICE that on June 1, 2005 the undersigned filed with the Clerk of this Court the GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR service of which is being made upon you.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____
JAMES BARZ
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-2817

| | | |
|---|---|---|
| STATE OF ILLINOIS | ) | |
| | ) | SS |
| COUNTY OF COOK | ) | |

Cindy Kirksey, being first duly sworn on oath, deposes and says that she is employed in the office of the United States Attorney for the Northern District of Illinois; that on June 1, 2005 she caused a copy of this notice and the above-described motion to be mailed to the above individual.

_____

SUBSCRIBED and SWORN TO before me
this 1st day of JUNE, 2005

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
Dorothy Flores
Notary Public, State of Illinois
My Commission Exp. 12/26/2005



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | JUN _ 1 2005 WH |
| vs. | ) | JUN 1 2005 |
| | ) | No. 03 CR 1004  MICHAEL W. DOBBINS |
| | ) | Judge Blanche M. Manning CLERK, U.S. DISTRICT COURT |
| JAYNE NGATIA | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR

The United States of America, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits its Response to Defendant's Objections to the PSR:

### INTRODUCTION

On October 21, 2003, defendant was charged in an one count indictment with importing heroin into the United States. On May 21, 2004, defendant pled guilty, without having entered into a plea agreement with the United States. The government has evidence to show that this was not defendant's first involvement with importing heroin into the United States. The government intends to introduce that evidence at the sentencing hearing, to inform the Court's judgment on the appropriate sentence for defendant.

### ARGUMENT

#### A.    The Burden of Proof at Sentencing is a Preponderance of the Evidence.

The crime defendant admitted carries a mandatory minimum 5 years imprisonment a maximum term of 40 years. 21 U.S.C. 960(b)(2)(A). In sentencing defendant, the Court must consider the factors set out in 18 U.S.C. §3553. Among those factors are the sentencing

guidelines. The guidelines are no longer mandatory, but are advisory and must be considered. According to the government's calculations and the calculations in the PSR, the advisory guideline sentencing range is 188-235 months. Defendant has disputed the range, and argues that, post *Booker*, any disputes must be resolved by proof beyond a reasonable doubt. However, that is wrong. The Seventh Circuit made clear that:

> *Booker* does not in the end move any decision from judge to jury, or change the burden of persuasion. The remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the sixth amendment so long as the guideline system has some flexibility in application.

*McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005).

## B. Reliable Evidence Supports the PSR's Guideline Calculations.

Defendant is a citizen of Kenya, who was arrested shortly after entering the United States. Most of the investigation has, necessarily, occurred after her initial arrest. That investigation has shown that defendant is deeply connected with the importation of heroin into the United States over a significant period of time.

1. The Charged Trip: October 14, 2003.

The government received a tip that defendant would be importing heroin. *See Exhibit A*.[1] Defendant has pled guilty to importing 690 grams of heroin into the United States from

---

[1]    The Court may consider any reliable evidence at sentencing and is not bound by the Federal Rules of Evidence. Fed. R. Evid. 1101(d)(3). Thus, the government submits the attached exhibits but also intends to call several witnesses at the sentencing hearing.

the Republic of Kenya. She did so by carrying swallowed packets of heroin into the United States, flying into O'Hare International Airport on October 14, 2003. *Id.*

When defendant landed, she initially lied to agents and claimed she was here for a fundraiser and that she would be staying with a friend, Virginia Newman, and that one of the family members would be picking her up. *Id.* An inspector called Virginia Newman who refuted this and said defendant was not expected for three weeks. *Id.* After admitting she was importing heroin, defendant lied again by telling investigators that she did not have a phone number or any contact information or otherwise know who she would deliver the drugs to in Chicago. *Id.* Ngatia lied again by stating that she was recruited to import the drugs by a man whose name she did not know. *Id.* While this story is suspicious on its face because it is used so frequently in drug cases, these latter two lies would be proven through subsequent investigation as discussed below.

Moreover, as further evidence of defendant's criminal intent, defendant was carrying a letter on the October 14, 2003 trip, from Virginia Newman. *Exhibit B.* Ms. Newman described defendant as a friend for many years that Ms. Newman had met pursuing charitable activities. *Id.* From the letter, it appears that defendant was targeting Ms. Newman for a bank fraud since the letter reveals that defendant had falsely told Ms. Newman that Ms. Newman needed to send a personal bank statement to assist defendant's entry into the United States. *Id.* Ms. Newman indicated in her letter that she did not want to take "such a risk"

3

because "unscrupulous people can take advantage of people who disclose such private information," and had not been asked to do so when sponsoring others. *Id.*

    2.     Defendant Arranged for others to Import Heroin into the United States before October 14, 2003.

Through subsequent investigation the government has learned that defendant organized at least two others to import heroin into the United States from Kenya. Both have been arrested and agreed to speak with the government about their prior trips and relationship to defendant.

*Millicent Njogu*

Among defendant's belongings was a note indicating a debt to Millicent Njogu. *Exhibit C.* On November 23, 2003, one month after defendant was arrested at O'Hare Airport, Millicent Njogu was arrested at John F. Kennedy International Airport after attempting to import heroin that she had swallowed and stored in other parts of her body. *Exhibit D.* In total Ms. Njogu had 1.3 kilograms of heroin. *Id.*

Ms. Njogu later provided information to the government about her prior trips. *Exhibit E.* She identified defendant as a women she knew in Kenya. *Exhibit E.* Defendant originally asked Ms. Njogu to sell her passport to defendant, and later asked her to swallow heroin and import it into the United States. *Exhibit E.* Defendant taught Ms. Njogu how to swallow pellets and gave her pellets to swallow and sent her to the United States on her first importation trip in May 2002. Defendant admitted to having other couriers and to being a courier. Defendant gave her $500 for expenses and directions on how to proceed once in the

4

United States. On that first trip, she flew into Detroit, Michigan and called defendant upon her arrival. Defendant told her to meet with "Chris" in Cleveland, Ohio and she did and then provided him with the heroin. *Id.*

Ms. Njogu's second trip was in September 2002, and again it was at the direction of defendant. She flew to Detroit and again met with "Chris." Defendant was involved in this trip as well. *Id.*

Ms. Njogu did three more trips to the United States and each time defendant provided her with the heroin, airline tickets, and instructions on how to proceed. On the third trip, she went to Newark, New Jersey met a mane named George Odegi and he drover her to Chicago. There she met with a man named "ADE" or "ID." *Id.*

Ms. Njogu stated that she was owed money from defendant, as reflected on defendant's papers. Ms. Njogu believes that defendant uses other females as drug couriers based upon having seen defendant with other females and based upon defendant having admitted to being involved with other couriers. *Id.* Ms. Njogu pled guilty in her case but has since returned to Kenya.

*Anne Njanja*

Five months after Millicent's arrest, Anne Njanja was arrested at the Hartsfield-Jackson International Airport in Atlanta for swallowing heroin packets and storing them in her body to import into the United States. *Exhibit F.*

5

Later, Ms. Njanja told agents about her prior trip in August 2003, where she had imported heroin and defendant had arranged that trip. *Id.* Defendant told Ms. Njanja that the trip would be paid for and Ms. Njanja would get an extra $2,000 to $3,000. Defendant showed her how to swallow pellets, gave her tickets, and instructions. *Id.* Ms. Njanja flew to Newark and took a bus to Detroit where she called defendant. Defendant told her how to expel the pellets and to clean them. The next day Chris arrived and took the drugs and paid her and told her to get the rest from defendant. Upon returning, defendant refused to pay her the rest. *Id.*

3.    Defendant's Prior Trips to the United States.

Millicent Njogu said that defendant admitted to being a courier herself when she recruited Ms. Njogu. *Exhibit E.* A review of defendant's passport shows 6 prior trips to the United States. *Exhibit G.* Each of those trips involved short stays and some were to similar destinations as Ms. Njogu.

Moreover, Ms. Newman was interviewed and described how defendant had done a 3 day visit in January 2002. *Exhibit H.* Ms. Newman explained that defendant requested to be dropped off alone at Wal-Mart and didn't want anyone looking over her shoulder while she shopped. *Id.* Defendant did not call to be picked up for four or five hours and asked to be picked up at the same Wal-Mart. *Id.* Defendant purchased a suitcase during this trip. *Id.* Chris Newman was also interviewed and said he could not understand how someone could spend so much time at a Wal-Mart and that they were worried since it had gotten dark. *Id.*

6

Ms. Newman's other son, Ted Newman, who works in the Clerk's Office, was also interviewed, and was aware of the Wal-Mart incident and how defendant missed the scheduled dinner plans. *Id.* He was also aware of defendant's request for his mother's bank statement and found this to be an unusual request. *Id.*

      4.     Defendant's "Safety Valve" Proffer.

Defendant met with the government on November 4, 2003, to attempt to qualify for the "safety valve" reduction. *Exhibit I.* However, rather than providing full and truthful information, defendant told more lies and did not provide a full story on her crime. She said she was recruited by two men, but only knew their first names, and had no idea why they recruited her. *Id.* She indicated that they taught her how to swallow the pellets. *Id.* She also said she had no contact information for anyone in the United States and that someone would greet her in her language and identify her by her clothes. *Id.* She also claimed the request for Ms. Newman's bank statement was a legitimate requirement of the U.S. Embassy in Nairobi. *Id.* She said one of the guys that sent her had a conversation with someone named "ID" and she did not know "ID" but assumed he was the person she would meet. *Id.* In fact, defendant well knew who "ID" was from having arranged prior trips for Ms. Njogu, but the government also learned that upon arrival at the MCC defendant told MCC Inmate Kayafaat Amoo that she knew "ID" and had a phone number and approximate address for him. *Exhibit K.*

7

In summary, far from qualifying for the safety valve, defendant told a completely false story to the government and refused to answer some of the questions asked of her.

## C. The Guideline Calculations in the PSR are Correct.

All of this evidence shows defendant was part of a conspiracy to import heroin into the United States with others. It more than qualifies as relevant conduct as it all occurred during the same time period and with a similar motive and methods.

### 1. Drug Quantity

Defendant should be held accountable for: (a) her charged trip, (b) the five trips of Ms. Njogu, (c) the trip by Ms. Njanja, and (d) defendant's six prior trips. A conservative estimate of the total quantity attributable to those 13 trips is more than 3 kilograms but less than 10 kilograms (or taking defendant's .691 kilograms X 13 trips for approximately 9 kilograms).[2] Thus, defendant's base offense level is 34.

### 2. Leadership.

Both Ms. Njogu and Ms. Njanja said they were recruited by defendant, instructed on how to swallow heroin, and directed by defendant on their prior trips. Thus, defendant clearly qualifies for a two level leadership enhancement to bring her adjusted offense level to 36.

---

[2] Note that Ms. Njogu imported 1.3 kilograms on her charged trip and stated that she brought similar quantities on her 5 prior trips for defendant. Thus, if those quantities were used defendant would be above 10 kilograms.

3.    Safety Valve and Acceptance.

In her written objections, defendant contests only the enhancements and not the findings that defendant did not qualify for the safety valve and acceptance of responsibility reductions. For all the reasons above, defendant does not qualify for those reductions, despite having done the bare minimum and admitted the charges because the "act of pleading guilty does not automatically entitle a defendant to the reduction" for acceptance of responsibility. *United States v. Hanhardt*, 361 F.3d 382, 390 (7th Cir. 2004); Guideline 3E1.1 Application Note 3 ("[a] defendant who enters a guilty plea is not entitled to an adjustment under [Section 3E1.1] as a matter of right").

In *Hanhardt*, the Seventh Circuit affirmed the denial of acceptance of responsibility for two defendants who pled guilty and explained that "the sentencing judge is required to look beyond 'formalistic expressions of culpability and determine whether the defendant has manifested an acceptance of personal responsibility for his offense in a moral sense." *Id.* (citations omitted). The reduction in Section 3E1.1 is only "designed to award a defendant who demonstrates contrition through an honest and full account of his offense conduct." *Id.* In making the determination, "[t]he sentencing court can require that the defendant provide a candid and full explanation of the circumstances surrounding the offense of conviction."

9

WHEREFORE, the government respectfully requests that defendant's objections to the PSR be overruled and that defendant be sentenced within the advisory guideline range of 188-235 months.

Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney

By: _____
JAMES E. BARZ
Assistant United States Attorney
219 South Dearborn, 3rd Floor
Chicago, IL 60604
(312) 353-5300

10

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE    1 |
| | 3. CASE NUMBER OH13HI04OH0002 |

4. TITLE: JAYNE NGATIA ET ALL

5. CASE STATUS:     INIT RPT

| 6. REPORT DATE<br>102103 | 7. DATE ASSIGNED<br>101403 | 8. CLASS<br>I | 9. PROGRAM CODE<br>301 | 10. REPORT NO.<br>001 |
|---|---|---|---|---|

11. RELATED CASE NUMBERS:     2004SA000045901

12. COLLATERAL REQ:

13. TYPE OF REPORT:
   INVESTIGATIVE FINDINGS

TOPIC: HEROIN TRAFFICKING ARREST   INTERNAL/BODY COURIER

14. SYNOPSIS:

On October 14, 2003, Immigration and Customs Enforcement (ICE) agents assigned to the Office of the Resident Agent in Charge (RAC) O'Hare International Airport were telephonically contacted by the Federal Bureau of Investigation (FBI).   The FBI advised that an arriving international passenger, Jane NGATIA, was suspected of carrying heroin into the United States.

Jayne NGATIA, a citizen and resident of the Republic of Kenya, arrived in the U. S. aboard British Airways flight 295 at approximately 11:30 a.m.   Following a secondary interview, inspectors discovered three packages containing heroin concealed in her undergarments.   NGATIA was transported to a local hospital for a voluntary medical exam, which led to the discovery of foreign objects in NGATIA.   NGATIA subsequently passed an additional 48 pellets containing suspected heroin.   The approximate gross weight of the heroin totaled 815.3 grams.

| 15. DISTRIBUTION:<br>RACOH SACCH CAPJ | 16. SIGNATURE:<br>MORISSETTE      SHARON            SENIOR SPEC AGENT |
|---|---|
| | 17. APPROVED:<br>LAVOIE      NATHAN   S   OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: OH<br>   O'HARE (CHICAGO) - R | 19. TELEPHONE: 847 635 6375 |
| | | 20. TYPIST: MORISSETTE |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE.   ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

GOVERNMENT
EXHIBIT

A

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE     2 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 001 |

DETAILS OF INVESTIGATION:

On October 14, 2003, through the Federal Bureau of Investigation (FBI) and the U. S. embassy in Kenya, ICE agents at the RAC O'Hare Airport received information from Kenyan Police Superintendent Nyabinge that a woman named Jane NGATIA was en route to the U. S. with heroin in her stomach. A physical description of NGATIA was provided. NGATIA was said to be the owner of Loreno Travels in Nairobi, Kenya. According to the information provided by Kenyan authorities, NGATIA was to be met in Chicago by a Nigerian male called WALUS.

The information was provided to CBP inspectors at O'Hare, who verified that a Jayne NGATIA was traveling aboard British Airways flight 295 from London to Chicago. NGATIA's travel had originated in Nairobi, Kenya. At approximately 11:30 a.m., NGATIA was identified as she disembarked the flight. An introductory interview took place and NGATIA stated that she was here in Chicago to attend a fundraiser for an African Charity. NGATIA was processed through the Immigration checkpoint. NGATIA retrieved one checked suitcase from the baggage carousel and proceeded to the Customs checkpoint. Based on the information received, NGATIA was then referred to the Customs secondary examination area for further inspection.

During the secondary examination, NGATIA was asked numerous standard questions. Following the interview, a personal search was undertaken based on several factors, including the information received from Kenyan authorities. NGATIA's travel history revealed several short trips to the U. S., which NGATIA denied in the interview. NGATIA stated that she would be staying with a friend in ▮▮▮▮▮▮▮, Illinois during her stay. A CBP inspector telephoned that individual, who said she was not expecting NGATIA for three weeks. NGATIA could not explain to the inspector why she was arriving early. NGATIA's ticket was purchased the day before her travel and was paid for in cash.

A pat down was conducted by two female inspectors in a private room. Three packages, each wrapped in what appeared to be cellophane, were discovered, one in the crotch area, and one under each breast. A field test was performed, producing a positive result for heroin. The approximate weight of the three packages totaled 191.1 grams. NGATIA voluntarily signed forms consenting to a pelvic/rectal examination by a physician and an ex-ray examination of her body by a medical facility.

Agents of ICE and the Drug Enforcement Administration (DEA) attempted to determine where NGATIA was to take the heroin. NGATIA initially stated that she was to get into a taxi and go to any hotel. NGATIA stated that an individual unknown to her would follow her to the hotel. She would then be contacted by that individual at a later time. Agents asked NGATIA what phone number she had to contact someone or in the event that the individual who was

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    3 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 001 |

supposed to follow her did not see her or was unable to follow her to whatever hotel she chose. NGATIA stated that she had no such number. NGATIA stated that the unknown individual knows what she looks like and what she would be wearing.

NGATIA was asked who gave her the drugs. She stated that she was approached at her place of business by a man whose name she does not know. He asked her if she wanted to make some money by bringing something to the U. S. She said she was to be paid $3,000 when she delivered the packages.

NGATIA said she met with the man a second time at a Wimpy's restaurant in Nairobi. He gave her a paper bag containing the pellets and $1,200 cash to purchase her airline ticket. She stated that she has no way to contact that individual, but believed that she would be paid if the packages were successfully delivered. NGATIA stated that she met this individual on only those two occasions.

NGATIA then stated that she was to exit the Customs area of the airport and wait in the terminal until someone approached her and greeted her by saying hello in her language. NGATIA would then give the packages to that individual and he or she would give her the money. NGATIA again stated that she had no way to contact that person. NGATIA stated that agents should bring her outside the Customs area into the terminal and she would try to meet with the individual. (Agent's Note: ICE agents declined to allow NGATIA to exit the Customs area and enter the terminal due to her possible medical condition).

NGATIA was asked how many pellets containing drugs she swallowed. She stated that she did not swallow pellets. She was asked what quantity of drugs she was given to bring to the U. S. and she answered that she did not know.

NGATIA stated that Virginia Newman is a close friend who lives in ▮▮▮▮▮, Illinois and is uninvolved in what NGATIA did. NGATIA asked agents and inspectors not to tell Mrs. Newman what had happened, as it would break Mrs. Newman's heart.

CBP inspectors transported NGATIA to Resurrection Hospital in Park Ridge, Illinois. An ex-ray examination confirmed the presence of oval-shaped foreign bodies in NGATIA.

At approximately 4:30 p.m., ICE agents advised NGATIA of her rights under Miranda. She stated that she wished to cooperate in the investigation, but would wait until the Court appointed an attorney to assist her. No further questions related to the smuggling of narcotics were asked after this time. NGATIA voluntarily signed a waiver of her rights under 5(a) of the Federal Rules of Criminal Procedure.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    4 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 001 |

Between the evening of October 14, 2003 and the early morning hours of October 17, 2003, 48 pellets were passed by NGATIA in monitored bowel movements. Field tests confirmed the presence of heroin.

On October 15, 16, and 17, 2003, Jayne NGATIA stated repeatedly that she wished to cooperate with investigating agents.

On October 17, 2003, NGATIA was released from Resurrection Hospital and transported to the RAC O'Hare for processing, after which she was transported to U. S. District Court in Chicago for an initial appearance. A preliminary hearing and a detention hearing were scheduled for Wednesday, October 22, 2003 and NGATIA was remanded to the custody of the U. S. Marshals.

The ICE RAC O'Hare investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

----- Original Message -----
**From:** Virginia Newman
**To:** Jayne Ngatia ; Jayne Ngatia-Bus.
**Sent:** Saturday, October 04, 2003 12:49 PM

To whom it May Concern:

I am writing on behalf of Jayne Ngatia, regarding her receiving a visa to visit the United States this fall.

Mrs. Ngatia has been a friend for several years and a frequent guest in my home, and I most sincerely hope to have her presence again as a guest, as well as to contribute her advice and assistance in our efforts to help A.I.C. Girls' Primary Boarding School in Kajiado, Kenya. I am on the Board of Directors of Humanitarian Efforts in African Learning, a non-profit organization here in the U.S. working to help fulfill some needs at A.I.C. School (as well as some other sister schools). Our hopeful plans include her making some presentations, including some to University groups in the Chicago area who are interested in lending assistance. She can give first-hand information . . . valuable information and details . . . to those far away from the scene in Kenya. I have no doubt in Mrs. Ngatia's integrity and her genuine desire to come here and help us in our efforts. She would be staying no longer than ten days. She would be staying in my home at ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

As for information that you might wish to know about me (in addition to working on the organization's behalf), I am a retired teacher, after directing students' classroom learning for thirty-five years here in the U.S. I have visited Kenya (and surroundings) three times; all previous visits with my husband (now deceased) who was an administrator of UARCO during the last twenty plus years of his life. Mrs. Priscilla Nangurai, headmistress of A.I.C. School, entertained my husband and me in her home during our last visit over there as we had the joyous experience of working with students at the school. Helping that school became a "mission in our lives"; and remains a mission in mine.

I have lived in ▉▉▉▉▉▉▉Illinois for the last thirty-six years, and in the same home for the past twenty years (where Mrs Ngatia has visited before). My husband and I have long been active in our community and church.

Mrs. Ngatia indicated that someone of whom she requested assistance in getting her visa, had told her that it would be required for me, as her hostess while she visits ▉▉▉▉▉▉, to send a copy of my own personal bank statement accompanying this invitation letter. I do not wish to take such a risk as mailing a document of that nature along with this request that she be allowed to visit us here. To mail such information is highly inadvisable. Unfortunately, unscrupulous individuals can take advantage of people who disclose such private information as bank accounts and social security numbers via the mail. Further, when I wrote a similar letter on behalf of Mrs. Nangurai's visit here, there was no mention of sending such personal business matters.

Therefore, I hope that this sincere request that Mrs. Ngatia be allowed to receive her visa and to spend some time here in Illinois with me and others and to assist us in our efforts can fulfill any requirements from me.

Sincerely,

Virginia L. Newman



GOVERNMENT EXHIBIT

B



Debt Balance → 4,000
Paid 02/02 → 9,000
Balance =) 5,000

JN

GOVERNMENT
EXHIBIT

C

CARDELL 800-783-0399

REQUESTED BY: HEGERICH, THOMAS S

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | | | 1. TECS ACCESS CODE 3 |
|---|---|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | | | 2. PAGE    1 |
| | | | 3. CASE NUMBER JK13HE04JK0050 |

4. TITLE: NJOGU, MILLICENT

5. CASE STATUS:    INIT RPT

| 6. REPORT DATE 120103 | 7. DATE ASSIGNED 112303 | 8. CLASS 3 | 9. PROGRAM CODE 535 | 10. REPORT NO. 001 |
|---|---|---|---|---|

11. RELATED CASE NUMBERS:

12. COLLATERAL REQ:

13. TYPE OF REPORT:
   INVESTIGATIVE FINDINGS /  MEMO OF INTERVIEW

TOPIC: ARREST OF MILLICENT NJOGU

14. SYNOPSIS:
On November 23, 2003, passenger Millicent NJOGU, a citizen of Kenya, arrived at John F. Kennedy (JFK) International Airport aboard British Airways Flight #117 from London, England. NJOGU was the subject of a Customs and Border Protection enforcement examination. During the examination, which included a pat-down search, Inspectors discovered a package containing a powdery substance in the groin area of NJOGU. This substance was field-tested and proved positive for heroin. NJOGU then admitted to Inspectors to having vaginal inserts and to ingesting pellets. An x-ray examination was then conducted, revealing that NJOGU was an internal narcotics courier. The approximate gross weight of the heroin seized was 1,315.2 grams.

The details are contained herein.

| 15. DISTRIBUTION: ASCJK SACNY ASCNK CARM | 16. SIGNATURE: GIOVANONI    MICHAEL    SPECIAL AGENT |
|---|---|
| | 17. APPROVED: WITZAL    MARK    A   SUP CRIM INVEST |
| | 18. ORIGIN OFFICE: JK JFK AIRPORT, NY - AS |
| | 19. TELEPHONE: 718 553 1825 |
| | 20. TYPIST: GIOVANONI |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

GOVERNMENT
EXHIBIT

D

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    2 |
|---|---|
| | 2. CASE NUMBER JK13HE04JK0050 |
| | 3. REPORT NUMBER: 001 |

CASE PROGRAM CODES:

535 JFK BORDER NARCOTICS   384 OPERATION TRIPLE CRO

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE    3 |
| REPORT OF INVESTIGATION CONTINUATION | 2. CASE NUMBER JK13HE04JK0050 |
| | 3. REPORT NUMBER: 001 |

DETAILS OF INVESTIGATION

On November 23, 2003, passenger Millicent NJOGU, a citizen of Kenya, arrived at John F. Kennedy (JFK) International Airport aboard British Airways Flight #117 from London, England. NJOGU was the subject of a Customs and Border Protection enforcement examination. During the examination, which included a pat-down search, Inspectors discovered a package containing a powdery substance in the groin area of NJOGU. This substance was field-tested and proved positive for heroin. The approximate gross weight of the heroin seized from the groin area was 224.7 grams. NJOGU then admitted to Inspectors to having vaginal inserts and to ingesting pellets. An x-ray examination was then conducted, revealing that NJOGU was an internal narcotics courier. The approximate gross weight of the heroin seized from the insert was 257.2 grams. NJOGU eventually passed a total of sixty-three (63) pellets of heroin with an approximate gross weight of 833.3 grams. The total gross weight of the heroin seized was 1,315.2 grams.

On November 23, 2003, at approximately 1435 hours, Special Agents from the Associate Special Agent in Charge, JFK Narcotics Unit responded to the seizure and placed NJOGU under arrest for the unlawful importation of cocaine. Prior to being questioned, NJOGU was advised of her Miranda warnings, which she stated she understood and voluntarily elected to waive. NJOGU stated the following in substance:

1. NJOGU stated that she thought that she was smuggling heroin. She thought that she swallowed sixty-five (65) pellets and inserted three (3) pellets. NJOGU expected to be paid between $3,000.00 to $4,000.00 USD. NJOGU stated that an individual named George MAINE recruited her to smuggle drugs. NJOGU advised Agents that MAINE lives in Nairobi and described him as a male, black, 5'8"-5'9" tall, big build with short hair. Prior to smuggling the narcotics, MAINE provided NJOGU with fake pellets so that she could practice swallowing them.

2. After swallowing the fake pellets successfully, MAINE kept in contact with NJOGU. For this current trip, MAINE provided NJOGU with the real pellets on the Friday night prior to traveling. MAINE instructed NJOGU to stay at an Econolodge in either New Jersey or New York. After checking in at the hotel, NJOGU was supposed to call MAINE at telephone number 2540734993736. Once NJOGU placed the telephone call, MAINE would give her instructions on what to do with the drugs.

3. NJOGU stated that in September 2003, she smuggled drugs into Newark, New Jersey. NJOGU further stated that she passed some of the drugs during her layover in London and threw some away, she brought the rest to Newark. After arriving in Newark, she stayed at the Econolodge near the airport. After

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE     4 |
|---|---|
| | 2. CASE NUMBER JK13HE04JK0050 |
| | 3. REPORT NUMBER: 001 |

checking in at the hotel, she called the previously listed telephone number for MAINE.  When she called, a woman named JAYNE LNU answered the phone and she spoke with JAYNE.  After waiting for a short time, a person called her hotel room and used code in speaking with her.  NJOGU stated that the person asked what she wanted.  She stated that she told him McDonalds.  This way when the man arrived, he would be carrying a McDonalds bag, that is how she would know it is the right person.  An individual named SAMMY came to her room. SAMMY is described as a male, dark skin, 5'11" tall with a fat build.  NJOGU eventually gave SAMMY the drugs that she had passed and he came a second time to pick up the drugs that she passed later on.  SAMMY then paid NJOGU $3,000.00 USD.  NJOGU stayed in the United States for five more days and then flew back to Africa.

This investigation is ongoing.

```
DEFENDANT:  NJOGU, Millicent, Wamuyu
      SEX:  Female
      DOB:  11/28/1964
   HEIGHT:  5'5"
   WEIGHT:  130lbs
     EYES:  Brown
     HAIR:  Black
 PASSPORT:  A453796 (Kenya)
  ADDRESS:  Box 773-48, Nairobi, Kenya
     TECS:  05/24/02-Detroit, 09/08/02-Detroit, 12/21/02-Newark,
            05/16/03-Detroit, 09/14/03-Newark
     NCIC:  Negative
```

VIOLATIONS:
21 U.S.C. 952 (Importation of heroin)

JUDICIAL DISTRICT:
Eastern District of New York

DATE, TIME AND PLACE OF ARREST:
On November 23, 2003, at approximately 1435 hours, NJOGU was arrested at the JFK Medical Center, John F. Kennedy International Airport, Jamaica, New York.

ACTIONS OF DEFENDANT:
On November 24, 2003, NJOGU was pre-arraigned at the United States Federal Court in the Eastern District of New York.  On November 26, 2003, NJOGU was arraigned at the United States Federal Court in the Eastern District of New York.

DRUG EVIDENCE:

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    5 |
| --- | --- |
| | 2. CASE NUMBER JK13HE04JK0050 |
| | 3. REPORT NUMBER: 001 |

Exhibit 1:   Six (1) PEE's containing suspected heroin with an
approximate gross weight of 1,315.2 grams.

NON-DRUG EVIDENCE:
Exhibit N-1:   One (1) Customs Declaration executed by NJOGU on
November 23, 2003.

Exhibit N-2:   One (1) pair of shorts worn by NJOGU.

WITNESSES;
Inspector Frank Iervasi
Bureau of Customs and Border Protection
JFK International Airport
Building 77
Jamaica, NY 11430

Special Agent Michael Giovanoni
Special Agent John Condon
Bureau of Immigration and Customs Enforcement
JFK International Airport
Building 75, Room 217
Jamaica, NY 11430

DEA CHEMIST:
Northeast Regional Laboratory
99 10th Avenue
New York, NY 10011

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

REQUESTED BY:  HEGERICH, THOMAS S
O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE    1 |
| | 3. CASE NUMBER OH13HI04OH0002 |

| 4. TITLE: JAYNE NGATIA ET ALL |

| 5. CASE STATUS:    INTERIM RPT |

| 6. REPORT DATE<br>032604 | 7. DATE ASSIGNED<br>101403 | 8. CLASS<br>I | 9. PROGRAM CODE<br>301 | 10. REPORT NO.<br>008 |
|---|---|---|---|---|

| 11. RELATED CASE NUMBERS: |

| 12. COLLATERAL REQ: |

| 13. TYPE OF REPORT:<br>   MEMO OF INTERVIEW |

| TOPIC: NJOGU PROFFER |

14. SYNOPSIS:

On November 23, 2003, Customs and Border Protection (CBP) Inspectors and Immigration and Customs Enforcement (ICE) Special Agents arrested Millicent NJOGU following the discovery of heroin packages concealed on her person. NJOGU consented to an ex-ray at a medical facility, where it was determined that she had foreign objects inside her digestive tract.  Pellets passed over the next several days also proved to contain heroin.  The gross weight of the heroin concealed in and on the person of Millicent NJOGU totaled approximately 1, 315 grams.

On December 22, 2003, Millicent NJOGU was interviewed at the offices of the United States Attorney in Brooklyn, New York.  Present in addition to NJOGU were her attorney, Heidi Cesare, Assistant United States Attorney (AUSA) Robert Capers, and ICE Special Agents Michael Giovanoni and Sharon Morissette. This report documents the information provided by NJOGU during this interview.

| 15. DISTRIBUTION:<br>RACOH SACCH CAPJ | 16. SIGNATURE:<br>   MORISSETTE      SHARON          SENIOR SPEC AGENT |
|---|---|
| | 17. APPROVED:<br>   LAVOIE         NATHAN     S  OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: OH<br>   O'HARE (CHICAGO) - R | 19. TELEPHONE: 847 635 6375 |
| | | 20. TYPIST: MORISSETTE |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

GOVERNMENT EXHIBIT

E

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    2 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 008 |

DETAILS OF INVESTIGATION:

On November 23, 2003, Millicent NJOGU arrived at New York's Kennedy International Airport aboard British Airways flight 117 from London. NJOGU's travel had originated in Nairobi, Kenya. NJOGU is a citizen and resident of Kenya. An examination by CBP inspectors, including a pat-down search, was conducted upon NJOGU's arrival in the United States, during which a package containing a white powdery substance was discovered concealed in NJOGU's undergarments. A field test confirmed the presence of heroin. NJOGU then admitted to having inserted and ingested heroin pellets before departing Nairobi.

NJOGU was transported to a medical facility, where an ex-ray examination of her pelvic region revealed the presence of foreign bodies. The approximate gross weight of the heroin pellets ingested, inserted, and concealed on the body of Millicent NJOGU totaled 1, 315.2 grams.

On December 22, 2003, an interview of Millicent NJOGU was conducted at the offices of the U.S. Attorney in Brooklyn, New York. Present in addition to NJOGU were her attorney, Heidi Cesare, AUSA Robert Capers, and ICE Special Agents Michael Giovanoni and Sharon Morissette. The interview was conducted under the terms of a proffer agreement. The following summarizes the statements made and information provided by Millicent NJOGU during this interview.

   1. NJOGU is 39 years of age and lives in Kenya. She is divorced and has one 18-year-old son. NJOGU works as a beauty consultant, administering massages and the like at hotels and spas. She has taken classes related to her employment and was previously employed at the Post Office.

   2. NJOGU wanted to move away from Kenya. In 1998, she obtained a passport with the assistance of a travel consultant known to her as FRANCIS. FRANCIS provided the passport application and drove NJOGU to pick up her passport, charging her 500 Kenyan shillings for his services. FRANCIS took possession of NJOGU's passport as soon as NJOGU received it, and he kept it until she paid off the 500 shillings she owed, about 2 years.

   3. In 2000, approximately 6 months after paying off her debt to FRANCIS and getting her passport back from him, NJOGU received a call from FRANCIS. He wanted to know why NJOGU had not yet used her passport for travel. FRANCIS asked NJOGU to come to his office to talk with him. FRANCIS introduced NJOGU to a woman named JAYNE, who arrived at the office with another male named MACHARIA.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE   3 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 008 |

(Agent's note:  NJOGU was shown a photo spread and identified a photo of Jayne NGATIA as the woman she knows as JAYNE.)

4. NGATIA offered to buy NJOGU's passport.  NGATIA offered 250,000 Kenyan shillings and said that she would travel on NJOGU's passport wearing a wig to pass as NJOGU.  NJOGU declined the offer.

5. Approximately 3 months later, NGATIA again approached NJOGU about selling her passport.  NGATIA said that someone else would travel using NJOGU's identity.  NJOGU again said no.  NGATIA then asked NJOGU to travel to the United States and transport curios and souvenir items with her.  NJOGU did not make the trip.

6. On another occasion, NGATIA called NJOGU and asked to meet her. When NJOGU arrived at the meeting location, NGATIA took her to another location, where a woman named MIRIAM met them.  NGATIA and MIRIAM explained that they wanted her to swallow pellets containing drugs and bring them to the U. S.  NGATIA and MIRIAM met with NJOGU again, where she was allowed to ask questions.

7. NGATIA brought NJOGU to NGATIA's house, where NGATIA gave NJOGU sample pellets.  NGATIA swallowed some of the sample pellets to demonstrate for NJOGU and NJOGU practiced.  NGATIA promised NJOGU 500,000 shillings for transporting the pellets.

8. In May 2002, NJOGU swallowed 63 pellets provided by NGATIA.  NGATIA gave NJOGU about $500 (USD) for spending money and instructed her to go to a motel NGATIA had chosen upon her arrival in the U. S.  NJOGU was to telephone NGATIA when she arrived at the motel.  NGATIA also gave specific instructions about taxis.  NGATIA then escorted NJOGU in a taxi to the airport in Nairobi.

9. NJOGU arrived in the U. S. at Detroit Metropolitan Airport.  She went to a motel that started with the letter M, but it was not the place she had been instructed to go.  NJOGU gave a taxi driver $10 to buy her a phone card and he got her a $5 phone card.  NJOGU waited 2 days before calling NGATIA with the motel phone number.  When she did make the call, NGATIA was very angry.  NGATIA told her to go to Cleveland.

10.    NJOGU took a taxi to Cleveland, paying about $200 for the trip. She checked into a motel outside Cleveland, possibly in Middleburg, Ohio.  The motel was the same chain as the one she had checked into in Detroit.  NJOGU again called NGATIA with the motel information.  NGATIA instructed NJOGU to wait at the motel until she was contacted by a

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    4 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 008 |

male, who would bring her food from McDonald's.

11.    A Nigerian male named CHRIS arrived at NJOGU's motel room with a McDonald's bag.  CHRIS is muscular and may be about 40 years old.  CHRIS took the pellets that NJOGU had passed to that point.

12.    NJOGU became very ill in the motel.  There were pellets stuck inside her.  CHRIS took NJOGU to his house, where she stayed almost a week.  CHRIS drove a Toyota RAV-4.  There were at least 2 other vehicles at his house, one a gold color and the other silver.  CHRIS lived in a single-family home within walking distance of a hospital and near a bus station.  CHRIS is married to a Jamaican woman and they had a baby boy in August or September 2003.  The baby, also named Chris, was pre-mature and was still hospitalized in September 2003.  CHRIS' brother, whose name NJOGU does not know, lived in the home, as well.

13.    CHRIS and his wife left one day during NJOGU's stay to drive to New York.  NJOGU was left at CHRIS' house with his brother.

14.    CHRIS said that 5 pellets passed by NJOGU did not contain heroin.  He was very angry.  NJOGU did not think that the sample pellets could have accidentally been mixed in with the heroin pellets because NJOGU only had 3 sample pellets.  CHRIS paid NJOGU $2,000.  NJOGU had been promised $3,000, but CHRIS told her to get the rest from NGATIA.

15.    When NJOGU returned to Kenya, NGATIA was waiting at the airport with a taxi to take NJOGU home.  NGATIA accused NJOGU of stealing some of the missing pellets and replacing them with sample pellets.  At NJOGU's home, NGATIA gave NJOGU 3 enemas.  NGATIA and a sister of MIRIAM stayed with NJOGU for several hours.  NGATIA did not pay NJOGU the other $1,000.

16.    In September 2002, NJOGU again traveled to the U. S. carrying drugs.  NGATIA again gave NJOGU pellets to swallow and several hundred U. S. dollars spending money.  NJOGU was supposed to fly into Newark, but missed her connection from Amsterdam to Newark and instead, flew to Detroit.  NJOGU took a bus to Cleveland and checked into the same motel beginning with the letter M.  NJOGU called NGATIA only after she arrived in the Cleveland area motel.  NGATIA was angry that NJOGU had gone to Detroit instead of Newark.  Again, CHRIS came to the motel, took possession of the heroin pellets, and paid NJOGU.

17.    On each of NJOGU's trips to the U. S. prior to November 2003, NGATIA provided the heroin pellets for NJOGU to smuggle.  NJOGU

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE    5 |
| --- | --- |
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 008 |

swallowed the pellets either at NGATIA's home or in hotel rooms. NGATIA provided the airline tickets, brought NJOGU to the airport, gave her the addresses to use on the U. S. Customs forms she would be required to fill out, and gave NJOGU specific instructions about where to stay in the U. S.  NGATIA met NJOGU at the airport each time she returned to Nairobi.

18.    In December 2002, NJOGU flew to Newark.  A Nigerian man met her at the airport there, asking her several times if she was Millicent. NGATIA had not told NJOGU that someone would be meeting her.  NJOGU said no, she was not Millicent, until the man asked if she had been sent by JAYNE.  The man had a flight scheduled from Newark to Chicago for that same evening, but was unable to get a reservation for NJOGU. The man then drove NJOGU to Chicago.

(Agent's note:  NJOGU was shown a photo spread and tentatively identified George ODEGI as the individual who drove her to Chicago.)

19.    NJOGU was taken to a motel that she believes started with the letter S on the south side of Chicago.  The motel was within walking distance of the Kaedi hair-braiding salon.  NJOGU did not see the man who met her in Newark again after he brought her to the hotel.  Another Nigerian male, named ADE or ID, came to her room and asked if she needed anything.

20.    NJOGU passed all of the pellets in 2 or 3 days, but had a return flight already scheduled, so she was in Chicago for 5 or 6 days.  ADE paid NJOGU $2,000 and NJOGU took a bus back to Newark to board her return flight.

21.    NJOGU took 5 trips to the U. S. prior to November 2003.  Each time, she swallowed between 60 and 70 pellets of heroin.  With the exception of the December 2002 trip, all of the heroin she smuggled was "CHRIS' work."

22.    In November 2003, NJOGU was contacted by a Nigerian male she believes called himself OUMA, who said he was the brother of CHRIS in Cleveland.  OUMA said he got NJOGU's number from CHRIS, but NJOGU did not believe that was true.  OUMA asked NJOGU to make another smuggling trip to the U. S.  NJOGU had a bad feeling about doing it, but agreed to fly to New York.  NJOGU did not think that NGATIA knew about the trip.  OUMA gave NJOGU pellets to swallow at a motel.  He also gave NJOGU her airline tickets and $600 spending money.

23.    Jayne NGATIA was sometimes working with MIRIAM and sometimes

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE    6 |
| --- | --- |
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 008 |

with MIRIAM's sister, whose name NJOGU does not know. NGATIA split off from them to make her own money, but didn't always have the money to buy the product. The last trip NJOGU took that she believed MIRIAM or her sister to be involved was possibly her 2nd or 3rd trip.

24.    NGATIA never paid NJOGU the money she promised. CHRIS would pay NJOGU less than she was owed and tell her to get the rest from NGATIA and NGATIA would say that CHRIS should have paid. NGATIA deducted the amounts spent on NJOGU's airfare, hotels, meals, and spending money from the amount she had promised. When NGATIA received money from MIRIAM, NJOGU believes NGATIA kept part of what was intended for NJOGU.

25.    Jayne NGATIA has borrowed money from NJOGU. A handwritten paper bearing Kenyan shilling figures and the signatures of NGATIA and NJOGU indicated a partial repayment and the balance still owed NJOGU by Jayne NGATIA.

(Agent's note: NJOGU was shown several photo spreads and identified the following photos Fred MARE as Jayne NGATIA's husband; Birgita OHANGA as a courier and close friend of Jayne NGATIA; Cynthia OSANYA as someone she has seen in Kenya; Lucy ALPHAXAD as someone she may have seen with NGATIA.)

26.    NGATIA uses other couriers. NJOGU has seen NGATIA with other girls NJOGU believed to be couriers. NGATIA has a close friend (OHANGA), who is also a courier. NGATIA has openly told NJOGU that she is a courier. She has asked NJOGU to smuggle drugs to the U. S. at times when NJOGU could not travel. NGATIA has then later told NJOGU that (OHANGA) made the trip instead.

27.    NGATIA knows a woman named DOROTHY, whose arrest was on the news in Kenya. NJOGU saw MIRIAM on the news when the government offered a reward for finding her. NJOGU has heard that MIRIAM's husband is in Uganda.

28.    Jayne NGATIA is married, but NJOGU does not know NGATIA to have children. NGATIA does have sisters. NGATIA is overly friendly when she wants something, but NJOGU was always suspicious of her. NJOGU's son has picked up money from NGATIA. NGATIA has made threats to talk to NJOGU's son if she is unhappy with NJOGU.

29.    NJOGU never brought anything back to Kenya from the U. S. She was never asked to transport money. NJOGU was always paid in U. S. dollars.

30.    Jayne NGATIA has never told NJOGU what to do if she were to be

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE    7 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 008 |

caught.  NGATIA was confident that it would never happen.

This investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

REQUESTED BY: HEGERICH, THOMAS S

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | 2. PAGE   1 |
| | 3. CASE NUMBER HF13HE04HF0027 |

4. TITLE: NJANJA, ANNE MUTHONI, ET AL

5. CASE STATUS:   INTERIM RPT

| 6. REPORT DATE 062904 | 7. DATE ASSIGNED 050504 | 8. CLASS 1 | 9. PROGRAM CODE 211 | 10. REPORT NO. 003 |
|---|---|---|---|---|

11. RELATED CASE NUMBERS:

12. COLLATERAL REQ:

13. TYPE OF REPORT:
   MEMO OF INTERVIEW      /   INVESTIGATIVE FINDINGS

TOPIC: PROFFER OF ANNE NJANJA

14. SYNOPSIS:
On May 3, 2004, at approximately 1600 hours, Anne Muthoni NJANJA arrived at the Hartsfield-Jackson International Airport, Atlanta, Georgia aboard British Airways flight #2227 from London, United Kingdom. Customs and Border Protection (CBP) inspectors selected NJANJA for secondary examination based upon a lookout in the Treasury Enforcement Communication System (TECS). During the inspection process, inspectors determined that NJANJA had ingested pellets containing heroin.

This Report of Investigation documents the proffer session with NJANJA and investigative activities of Special Agents of the Office of the Resident Agent in Charge (RAC)/Hartsfield.

| 15. DISTRIBUTION: RACHF SACAT CAPJ  RACOH | 16. SIGNATURE: DARIN        JEFFREY    A  SPECIAL AGENT |
|---|---|
| | 17. APPROVED: ROSE         STEPHEN    K  LOCAL/STATE POLICE |
| | 18. ORIGIN OFFICE: HF HARTSFIELD INT'L AIR | 19. TELEPHONE: 404 765 2210 |
| | 20. TYPIST: DARIN |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

GOVERNMENT
EXHIBIT
F

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    2 |
| | 2. CASE NUMBER HF13HE04HF0027 |
| | 3. REPORT NUMBER: 003 |

CASE PROGRAM CODES:

211 HIDTA PROGRAM          301 CONTROLLED SUBSTANCE

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE    3 |
|---|---|
| | 2. CASE NUMBER HF13HE04HF0027 |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | 3. REPORT NUMBER: 003 |

DETAILS OF INVESTIGATION:

On June 23, 2004, Special Agents Jeff DaRin and Richard Beamish along with Assistant United States Attorney Carol Kayser met with Anne NJANJA and her appointed counsel Paul Kish for the purpose of NJANJA providing information to ICE.

During the debriefing, NJANJA explained that approximately three weeks prior she had been approached by a subject she knew as John FOBIA. NJANJA explained that FOBIA had requested NJANJA to carry a parcel to the United States for him and that she would be paid. NJANJA advised that she initially rejected FOBIA's request. NJANJA advised that over the three-week period leading up to her travel to the United States, FOBIA approached her several times with the same request. NJANJA advised that on Thursday April 29, 2004 she agreed to carry the parcel to the United States for FOBIA.

NJANJA advised that on Sunday, May 2, 2004, she received a call from FOBIA telling her to step out of her residence to the street to meet with FOBIA. NJANJA advised that FOBIA was waiting in a taxi outside of her apartment building. NJANJA stated that FOBIA handed her a black paper bag containing a number of pellets and three tablets (Imodium) to take after ingesting the pellets. NJANJA advised that FOBIA told her how to ingest the pellets and also told her to vaginally insert the larger pellets if she could not swallow them. NJANJA stated that FOBIA requested that she call prior to leaving Nairobi, Kenya and advise what she would be wearing. FOBIA explained that this would be passed to the person who was to meet her at the Hartsfield-Jackson International Airport.

NJANJA stated that she knew nothing about the person she was to meet in Atlanta. NJANJA advised that she only knew that the person would meet her before she exited the building near the baggage claim. NJANJA stated that she was advised by FOBIA that she would receive payment from the subject in Atlanta after passing the pellets she ingested. NJANJA further stated that she would know it was the right person in Atlanta if they asked her if she was sent by FOBIA.

NJANJA advised that in August 2003 she had made a trip to the United States for the purpose of smuggling ingested heroin. NJANJA stated a subject named JANE NGATIA arranged the trip.

NJANJA stated that NGATIA arrived at her beauty shop in Nairobi, Kenya with three other subjects. During the visit, NGATIA advised that she worked for a travel agency and that if NJANJA needed tickets for travel that NGATIA could provide them.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    4 |
|---|---|
| | 2. CASE NUMBER HF13HE04HF0027 |
| | 3. REPORT NUMBER: 003 |

NJANJA advised that during her second encounter with NGATIA she was asked by NGATIA to carry narcotics into the United States. NGATIA told NJANJA that the travel would be paid for and that NJANJA would be paid an additional two or three thousand dollars upon arrival in the United States. NJANJA stated that she agreed to make the trip for NGATIA during this second encounter.

NJANJA advised that prior to her travel to the United States, NGATIA brought NJANJA to a hotel in Nairobi. At the hotel NJANJA was shown how to ingest the pellets containing the narcotics. NJANJA stated that while ingesting the pellets NGATIA left the hotel room and an unknown black female sat in the room with NJANJA. Once NJANJA had ingested the pellets, NGATIA returned and provided airline tickets, instructions on how to conduct the delivery and an address to utilize on any Customs or Immigration paperwork.

NJANJA stated that she flew into Newark, New Jersey and then traveled by Greyhound Bus to Detroit, Michigan. Upon arrival in Detroit, NJANJA checked into the hotel where NGATIA advised her to stay. NJANJA advised that she placed a call to NGATIA and advised her that she had arrived in Detroit and was currently at the hotel. NGATIA provided NJANJA with instructions on how to expel the pellets and how to clean and package the pellets that were expelled.

NJANJA stated that on the second day a Nigerian male, who NJANJA only knew as CHRIS, arrived at the hotel room and obtained the pellets that NJANJA had passed. NJANJA stated that at that time she had not passed all of the pellets so CHRIS stated that he would return, pay NJANJA, and obtain the remaining pellets.

NJANJA stated that the next day CHRIS returned, paid NJANJA one thousand dollars, and obtained the remainder of the pellets. NJANJA advised that she asked CHRIS about the balance of the money that she was owed and CHRIS advised that she would have to obtain the balance from NGATIA when NJANJA returned to Nairobi.

NJANJA stated that she left Detroit on Greyhound and traveled to New York, New York. NJANJA advised that she stayed at the American Inn in New York for approximately four days before returning to Detroit an another Greyhound Bus. NJANJA advised that she attempted to collect the balance of the money she was owed from CHRIS but was again advised to contact NGATIA when she returned to Nairobi. NJANJA described CHRIS as a Nigerian male, black, approximately thirty years of age, approximately five foot ten inches tall, with short hair, driving a sport utility vehicle.

NJANJA advised that she flew back to Nairobi, Kenya from Detroit and made contact with NGATIA. NJANJA stated that NGATIA refused to pay the balance of

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE    5 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | 2. CASE NUMBER HF13HE04HF0027 |
| | 3. REPORT NUMBER: 003 |

the transportation fee but did introduce NJANJA to a subject named NGUKU. NJANJA stated that NGUKU attempted to have NJANJA smuggled a second load of narcotics into the United States but NJANJA refused. NJANJA advised that it was her belief that NGATIA and NGUKU were working together in the smuggling business.

The investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

REQUESTED BY: MORISSETTE, SHARON

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

&lt;APPROVED&gt;  SEACATS - INCIDENT REPORT &lt;APPROVED&gt;     PAGE   5
                                                         TIN00223

INCIDENT  NBR: 2004SA000045901          FP&F CASE NBR: 2004390100002401
VIOLATOR NAME: NGATIA, JAYNE  MUMBI
TOPIC: HEROIN INTERNAL AND BODY CARRY/815.3GR/BA295/NGATIA,JAYNE

NAIROBI KENYA VIA LONDON ENGLAND.PRIOR INTELLIGENCE RECEIVED FROM THE U.S.
STATE DEPARTMENT OFFICE IN NAIROBI INDICATED PASSENGER NGATIA MIGHT BE A HEROIN
SMUGGLER. PASSENGER NGATIA HAD PURCHASED HER AIRLINE TICKET THE SAME DAY OF
TRAVEL WITH CASH THROUGH DEBONAIR TRAVEL LTD.PASSENGER NGATIA WAS INITIALLY
DENIED A U.S. VISA ON 10/2/03 DUE TO LACK OF SUFFICIENT DOCUMENTS. PASSENGER
NGATIA FINALLY OBTAINED HER VISA ON 10/7/03 IN NAIROBI. PASSENGER NGATIA HAD
6 PRIOR TRIPS TO THE U.S. WITH SHORT STAYS.
AFTER PASSENGER NGATIA COLLECTED HER LUGGAGE,SHE WAS APPROACHED BY SI ZUNIGA
WHO ASKED PASSENGER NGATIA FOR HER DOCUMENTS. ALTHOUGH SI ZUNIGA ASKED HER IN A
LOUD VOICE, PASSENGER NGATIA TURNED HER HEAD, PRETENDED NOT TO HEAR SI ZUNIGA,
AND KEPT WALKING TOWARDS THE SECURITY CHECKPOINT. WHEN SI ZUNIGA ASKED
PASSENGER NGATIA QUESTIONS ABOUT THE PURPOSE OF HER VISIT TO THE U.S. PASSENGER
NGATIA WOULD NOT ANSWER WITH SPECIFIC ANSWERS. PASSENGER NGATIA WAS TAKEN TO
BAGGAGE CONTROL SECONDARY FOR FURTHER INTERVIEW AND BAGGAGE EXAM. DURING THE

INTERVIEW PASSENGER NGATIA DID NOT LOOK THE INSPECTOR IN THE EYES BUT RATHER
LOOKED AROUND THE FIS AREA. PASSENGER NGATIA ALSO CONTINOUSLY LICKED HER LIPS.
AFTER OBTAINING A BINDING DECLARATION, A BAGGAGE EXAM WAS CONDUCTED. DURING THE
EXAM, PASSENGER NGATIA CLAIMED SHE WOULD RAISE FUNDS FOR A NON PROFIT ORGANIZ-
ATION THAT PROMOTES HUMAN EFFORTS FOR AFRICAN LEARNING AND WOMEN'S RIGHTS.
PASSENGER NGATIA TOLD SI ZUNIGA THAT SHE WOULD BE STAYING AT MRS. VIRGINIA
NEWMAN'S HOME IN▉▉▉▉▉▉▉▉▉ILLINOIS. PASSENGER NGATIA TOLD SI ZUNIGA THAT SHE
HAD VISITED MRS. NEWMAN IN THE PAST AND PROCEEDED TO SHOW SI ZUNIGA PICTURES OF
HER AND MRS. NEWMAN. PASSENGER NGATIA CLAIMED THAT EITHER MRS. NEWMAN OR HER
SON CHRIS NEWMAN WOULD BE PICKING HER UP. SI ZUNIGA ASKED PASSENGER NGATIA
ABOUT HER PRIOR TRIPS TO THE U.S. PASSENGER NGATIA TOLD SI ZUNIGA THAT THE LAST
TIME SHE HAD BEEN TO THE U.S. WAS IN APRIL OF 2003 TO VISIT HER SISTER IN NEW
JERSEY. PASSENGER NGATIA CLAIMED SHE STAYED WITH HER SISTER FOR THREE WEEKS.
WHEN ASKED BY SI ZUNIGA ABOUT HER AIRLINE TICKET, PASSENGER NGATIA EXPLAINED
THAT THE TICKET HAD BEEN PURCHASED BY THE NON PROFIT ORGANIZATION, WHO SENT IT

TO HER.PASSENGER NGATIA TOLD SI ZUNIGA THAT SHE WORKS AT LOREN TRAVEL SERVICES
AS A MANAGER AND SHE HAS WORKED IN THE TRAVEL INDUSTRY FOR THE PAST 9 YEARS.
SI ZUNIGA ASKED PASSENGER NGATIA WHY HER AIRLINE TICKET WAS NOT PURCHASED
THROUGH THE TRAVEL AGENCY SHE WORKED AT, SHE CLAIMED THAT SINCE THE ORGANIZTION
PURCHASED THE TICKET SHE HAD NOTHING TO DO WITH ARRANGING HER OWN TRAVEL.DURING
THE EXAM, PASSENGER NGATIA ALSO PRODUCED LETTERS THAT ATTEMTPED TO JUSTIFY HER
VISIT.ONE LETTER WAS FROM MRS. NEWMAN EXPLAINING HER RELATIONSHIP TO PASSENGER
NGATIA, ANOTHER LETTER WAS FROM A BRITISH AIRWAYS MANAGER EXPLAINING THAT
PASSENGER NGATIA WAS A FREQUENT FLYER CLUB MEMBER. A THIRD LETTER WAS FROM
A HISTORY/POLITICAL SCIENCE TEACHER AT▉▉▉▉▉COMMUNITY COLLEGE SAYING THAT
PASSENGER NGATIA'S VISIT TO THE U.S. WAS TO SPEAK AT THE COLLEGE. FINALLY
PASSENGER NGATIA ALSO PRESENTED AN AFFIDAVIT FROM A NOTARY PUBLIC THAT SHE
WAS TRUTHFUL IN HER VISA APPLICATION.

SI PERSONETT ASSISTED SI ZUNIGA DURING THE BAG EXAM AND INTERVIEW.
       OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

GOVERNMENT
EXHIBIT

G

CABELS 800.790.0899

REQUESTED BY: MORISSETTE, SHARON

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED> SEACATS - INCIDENT REPORT <APPROVED>      PAGE   6
                                                     TIN00223

INCIDENT  NBR: 2004SA000045901          FP&F CASE NBR: 2004390100002401
VIOLATOR NAME: NGATIA, JAYNE  MUMBI
TOPIC: HEROIN INTERNAL AND BODY CARRY/815.3GR/BA295/NGATIA,JAYNE


THE FOLLOWING INCONSISTENCIES WERE FOUND IN PASSENGER NGATIA'S STORY:
INITIALLY CLAIMING THAT SHE WOULD BE HERE TO RAISE FUNDS FOR A CHARITY
ORGANIZTION, PASSENGER NGATIA THEN TOLD THE INSPECTORS THAT SHE WOULD BE
LECTURING AT A UNIVERSITY. PASSENGER NGATIA HAD CLAIMED THAT A MEMBER OF THE
NEWMAN FAMILY WOULD PICK HER UP BUT WHEN PAGED IN THE LOBBY AREA NO ONE WAS
WAITING FOR HER. PASSENGER NGATIA STATED THAT THE LAST TIME SHE WAS IN THE U.S.
SHE STAYED WITH HER SISTER IN NEW JERSEY FOR THREE WEEKS. PASSENGER NGATIA THEN
STATED THAT THE MAXIMUM TIME SHE STAYED WAS 10 DAYS BUT COULD NOT REALLY RECALL
THE DATES. TECS CROSSING DATA SHOWED THAT PASSENGER NGATIA ACTUALLY ENTERED THE
U.S. ON 4/20/03 AND DEPARTED 4/22/03. THE ENTRY AND EXIT STAMPS IN PASSENGER
NGATIA'S PASSPORT WERE ALSO CONSISTENT WITH TECS CROSSING DATA. WHEN MRS.NEWMAN
WAS CONTACTED SHE EXPLAINED TO SI PERSONETT THAT ALTHOUGH SHE WAS EXPECTING
PASSENGER NGATIA, IT WAS NOT FOR ANOTHER THREE WEEKS. MRS. NEWMAN EXPLAINED TO
SI PERSONETT THAT SHE WOULD BE HAVING HIP SURGERY AND THAT PASSENGER NGATIA WAS
GOING TO ASSIST HER DURING HER RECOVERY. PASSENGER NGATIA HAD INITIALLY CLAIMED

SHE WAS MARRIED BUT DURING THE EXAM PASSPORT PHOTOS OF A MALE WERE FOUND. WHEN
SI ZUNIGA ASKED WHO THE MALE WAS PASSENGER NGATIA STATED THAT IT WAS HER
BOYFRIEND. WHEN SI ZUNIGA ASKED PASSENGER NGATIA ABOUT HER HUSBAND, SHE
CORRECTED HERSELF AND SAID THAT THE PICTURE WAS ACTUALLY OF HER HUSBAND.
A FOIL PACK OF IMMODIUM AD WAS FOUND IN PASSENGER NGATIA'S CARRY ON BAG. THE
PACK WAS FOR 6 PILLS BUT 4 WERE MISSING. PASSENGER NGATIA WOULD NOT ANSWER SI
ZUNIGA WHEN ASKED IF SHE HAD TAKEN ANY OF THE PILLS. FINALLY WHEN THE SUBJECT
OF POSSIBLE INGESTATION OF DRUGS WAS MENTIONED,PASSENGER NGATIA REMOVED HER
SHOES, TOOK OFF HER SOCKS, AND PUT HER SHOES BACK ON.
BASED ON THE INTELLIGENCE RECEIVED, REVIEW OF TRAVEL DOCUMENTS, PLUS THE
INCONSISTENCIES IN PASSENGER NGATIA'S STORY,A PERSONAL SEARCH WAS REQUESTED.
SCI HARRIS AUTHORIZED THE PERSONAL SEARCH. SI ZUNIGA HAD PASSENGER NGATIA
INTERLACE HER FINGERS BEHING HER BACK.SI ZUNIGA THEN GRABBED PASSENGER NGATIA'S
FINGERS AND PROCEEDED TO PAT HER DOWN. AT THIS POINT PASSENGER NGATIA ATTEMPTED
TO STRUGGLE WITH SI ZUNIGA BY TRYING TO GET OUT OF SI ZUNIGA'S CONTROL.

SI ZUNIGA WARNED PASSENGER NGATIA TO COMPLY OR SI ZUNIGA WOULD BE FORCED TO
RESTRAIN HER. PASSENGER NGATIA STOPPED STRUGGLING AND COMPLIED WITH SI ZUNIGA'S
INSTRUCTIONS. THE PATDOWN REVEALED ONE HARD SHAPED OBJECT UNDER EACH BREAST AND
ANOTHER HARD OBJECT IN HER UNDERWEAR. A PARTIAL BODY SEARCH WAS REQUESTED AND
GRANTED BY SCI HARRIS. PASSENGER NGATIA REMOVED ONE PELLET FROM UNDER EACH
BREAST AND A LARGER PELLET FROM HER UNDERWEAR. BASED ON ARTICULABLE FACTS,
SCI HARRIS DETERMINED THERE WAS REASONABLE SUSPICION TO PRESENT PASSENGER
NGATIA WITH AN X-RAY CONSENT FORM. THE PASSENGER CONSENTED TO AN X-RAY AND WAS
TRANSPORTED TO A MEDICAL FACILITY FOR X-RAY AND SUBSEQUENT MONITORED BOWEL
MOVEMENT. THE MONITORED BOWEL MOVEMENT REVEALED 48 PELLETS CONTAING AN OFF
WHITE POWDERY SUBSTANCE WHICH FIELD TESTED POSITIVE FOR HEROIN. THE TOTAL
AMOUNT OF HEROIN SEIZED WAS 815.3GR. THE HEROIN, DOCUMENTS, AND THE VIOLATOR
WERE TOT ICE ON CF 6051#2236531 AND 2236533.
          OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE    1 |
| | 3. CASE NUMBER OH13HI04OH0002 |

**4. TITLE:** JAYNE NGATIA ET ALL

**5. CASE STATUS:**    INTERIM RPT

| 6. REPORT DATE<br>111303 | 7. DATE ASSIGNED<br>101403 | 8. CLASS<br>I | 9. PROGRAM CODE<br>301 | 10. REPORT NO.<br>002 |
|---|---|---|---|---|

**11. RELATED CASE NUMBERS:**

**12. COLLATERAL REQ:**

**13. TYPE OF REPORT:**
   MEMO OF INTERVIEW

**TOPIC:** INTERVIEW OF VIRGINIA NEWMAN

**14. SYNOPSIS:**
On October 14, 2003, Jayne Mumbi NGATIA, a citizen and resident of the Republic of Kenya, was arrested at O'Hare International Airport in Chicago following the discovery of three packages containing heroin concealed in her undergarments.  NGATIA was taken to a local hospital, where she passed 48 additional pellets containing heroin.  The approximate gross weight of the heroin totaled 815.3 grams.

NGATIA stated to Customs and Border Protection (CBP) inspectors upon her arrival in the United States that she would be staying with Virginia Newman in ▓▓▓▓▓▓▓ Illinois and that she would be involved in a fund-raising effort on behalf of a school in Kenya.  NGATIA also stated that she was to speak at Roosevelt University.  On October 27, 2003, Virginia Newman, Lois Richards, and Christopher Newman were interviewed by agents of Immigration and Customs Enforcement (ICE).  This report documents the information gathered in those interviews.

| 15. DISTRIBUTION:<br>RACOH SACCH | 16. SIGNATURE:<br>MORISSETTE        SHARON          SENIOR SPEC AGENT |
|---|---|
| | 17. APPROVED:<br>LAVOIE        NATHAN     S  OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: OH<br>O'HARE (CHICAGO) - R | 19. TELEPHONE: 847 635 6375 |
| | 20. TYPIST: MORISSETTE |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

GOVERNMENT
EXHIBIT

H

JN

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE 3 |
|---|---|
| R E P O R T  O F  I N V E S T I G A T I O N  C O N T I N U A T I O N | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 002 |

about travel matters, NGATIA noticed a twitch in Mr. Newman's eye. She insisted that he see a doctor and took him to a local hospital. Mr. Newman was later diagnosed with a brain tumor. Mrs. Newman has considered Jayne NGATIA a close family friend since that time. Virginia Newman's last trip to Kenya was about two years ago.

3. Jayne NGATIA now runs her own travel agency. Mrs. Newman does not know if NGATIA owns the agency or manages it. NGATIA has several times mentioned attempts to form a partnership with someone in Canada, but said the deal fell through.

4. Jayne NGATIA visited Virginia Newman ██████████ in late January 2002 for approximately three days. Mrs. Newman picked NGATIA up on January 25, 2002 at the home of friends of NGATIA, who lived in Prospect Heights, Illinois. At the end of NGATIA's visit, Mrs. Newman dropped her off at the same Prospect Heights address. NGATIA told Mrs. Newman that prior to her arrival in the Chicago area, she had been in Canada on business. Mrs. Newman neither picked Jayne NGATIA up at the airport nor dropped her off there.

5. Jayne NGATIA's friends, African women named Brigitte OHANGA, Cynthia LNU, and Caroline LNU, lived at ██████████████████████ Prospect Heights. Their telephone number was ████████ Mrs. Newman met the three.

6. During NGATIA's visit, Virginia Newman and her granddaughter ████ took NGATIA shopping at a local Target store. NGATIA asked that afternoon to be dropped off alone at a Wal-Mart store. She said that she didn't like anyone looking over her shoulder while she shopped and she wanted to get finished early. NGATIA was to telephone the Newmans when she was finished shopping. Several hours went by, perhaps four or five, and it was dark outside before NGATIA called and asked to be picked up at the same Wal-Mart store. By that time, the family had become very worried.

7. NGATIA purchased a suitcase during her 2002 visit, because the clothing she had bought would not fit in the suitcase she had brought with her.

8. Mrs. Newman and NGATIA corresponded by telephone and e-mail. In 2003, they discussed the timing of a visit NGATIA was planning. Mrs. Newman told NGATIA that she should wait until after mid-November, when Mrs. Newman was having hip replacement surgery. Mrs. Newman could then travel back to Kenya with NGATIA.

9. NGATIA told Mrs. Newman that she was having trouble getting a visa. She asked for letters of invitation. Mrs. Newman agreed to write a letter on

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| | |
|---|---|
| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    4 |
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 002 |

NGATIA's behalf.  Her son, Christopher Newman, a political science professor, agreed to write an invitation to visit.

10.    During one conversation, NGATIA told Mrs. Newman in an off-handed way that in order for NGATIA to get her visa renewed, a copy of Mrs. Newman's personal bank statement should be sent.  NGATIA said that it was required as proof that Mrs. Newman could afford to have NGATIA stay in her home for a visit.  NGATIA told Mrs. Newman that it did not need to be a current statement, but warned Mrs. Newman not to give her Social Security Number. It was unclear to Mrs. Newman whether NGATIA was claiming someone at the embassy had made the request for the bank statement or whether it was someone with U. S. Immigration.

11.    Mrs. Newman was suspicious of the request for her bank statement and did not intend to send the copy.  Mrs. Newman did not give NGATIA any answer about the bank statement during their phone conversation.  She wanted to find a nice way to say no to NGATIA, so she waited until she wrote the letter on NGATIA's behalf to explain that she did not feel secure in sending such personal information.  Mrs. Newman discussed NGATIA's request for a bank statement with both of her sons and with a family friend, Lois Richards.

12.    Jayne NGATIA has a sister, Margaret NGATIA, who lives in the Atlanta area.  Margaret, also called Nunu, visited Mrs. Newman in August 2002. Mrs. Newman took Margaret to the home of Jayne's friends in Prospect Heights, Illinois.  They were to take Margaret to the airport.

13.    Margaret was attempting to gain acceptance to a nursing school and Christopher Newman wrote a letter on her behalf.  Margaret's home telephone number is ███████████████.  Her cell phone number is ████████████. Margaret's e-mail address is ██████████████████  Margaret has been in the U. S. for about a year.  She and Jayne NGATIA may have cousins in the Atlanta area.  Jayne and Margaret NGATIA's mother lives in Australia and is in the used clothing business.

Virginia Newman provided agents with copies of e-mail correspondence between herself and Jayne NGATIA.  She also provided telephone numbers for her sons, Christopher Newman and Ted Newman.  Mrs. Newman contacted her friend, Lois Richards.

Lois Richards also lives in ██████████  Illinois.  Her telephone number is ██████████.  Mrs. Richards was interviewed at the Newman home immediately after the interview of Virginia Newman on October 27, 2003.  Mrs. Richards provided agents with photographs taken during a sightseeing trip to Chicago taken by herself, Virginia Newman, and Jayne NGATIA on January 28, 2002.  That

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    5 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 002 |

was the only time that Lois Richards met Jayne NGATIA. Mrs. Richards does not believe that NGATIA travels to the U. S. often.

Lois Richards recalls Virginia Newman telling her about NGATIA's request for copies of a personal bank statement. Mrs. Newman told Mrs. Richards that the request was made very casually, but then NGATIA had said, "Be sure not to give your Social Security Number." Both women were suspicious of the request and Mrs. Newman did not intend to comply with the request.

Also on October 27, 2003, ICE agents interviewed Christopher Newman at ▆▆▆▆▆ University in ▆▆▆▆▆ Illinois. Newman provided the following information.

1. Christopher Newman met Jayne NGATIA when she visited his mother in January 2002. NGATIA met his mother, Virginia Newman, through the travel agency where NGATIA worked in Kenya.

2. Some of Newman's family had gone shopping with NGATIA during her visit to the U. S. NGATIA had asked to be left to shop alone and the family became very concerned when she was gone for several hours and it had gotten dark before she telephoned to have someone pick her up. The family was so relieved that NGATIA was all right that they did not ask for an explanation for her absence. Newman wondered how anyone could spend so much time in a Wal-Mart store.

3. Jayne NGATIA has very little, if anything, to do with the school that the Newman family supports in Kenya. She talked of going out to visit the school when Newman was unable to reach Priscillah Nangurai and was supposed to get back to the family with details of her visit, but to Newman's knowledge, she did not make such a visit.

4. Christopher Newman wrote an invitation for NGATIA to visit the U. S. at NGATIA's request. She had no speaking engagements scheduled.

5. Priscillah Nangurai spoke in October 2002 in both Chicago and Elgin, Illinois about women's issues and general topics. She is an engaging speaker and very skilled at raising awareness of the plight of the girls housed at the Masai school and support for the school's efforts to better the girls' situation. Newman has discussed the possibility of having NGATIA speak, as she is uninvolved with the school and might be able to provide an audience with an objective view of the sometimes brutal treatment of the Masai girls.

6. Around the same time that Newman met Jayne NGATIA, he was asked to write a letter on behalf of NGATIA's sister, Nunu, who wanted acceptance into the

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    6 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 002 |

█████████ University nursing program. Newman wrote the letter, but does not know whether Nunu ever applied to the program. She does not attend the university.

7. Jayne NGATIA has friends in Prospect Heights, Illinois. Christopher Newman does not know them.

8. Virginia Newman told Christopher Newman that Jayne NGATIA had asked for a copy of Mrs. Newman's personal bank statement. NGATIA said that it would be required in order for her to get her visa renewed. Mrs. Newman had described the casual way in which NGATIA had made the request. Christopher Newman was upset by the request, and his brother, Ted Newman, reacted very strongly.

Christopher Newman agreed to review his e-mails and provide agents with copies of correspondence to and from Jayne NGATIA.

The RAC O'Hare investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

```
111303                     TECS II - LIST OF RELATED RECORDS              PAGE   1
                                                                          TN007064
                        2 RECORDS ARE RELATED TO BASE RECORD
OH13HI04OH0002002    ROI   COH MORISSETTE          S 111303


P9D82361700COH        NGATIA          JAYNE       M B F 052872
        SC  SUBJECT OF CURRENT INVESTIGATION                    SUB-SOURCE

OH13HI04OH0002        CASE COH MORISSETTE        S 101403
        JAYNE NGATIA ET ALL
```

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | 2. PAGE    1 |
| | 3. CASE NUMBER OH13HI04OH0002 |

**4. TITLE:** JAYNE NGATIA ET ALL

**5. CASE STATUS:**    INTERIM RPT

| 6. REPORT DATE 111303 | 7. DATE ASSIGNED 101403 | 8. CLASS I | 9. PROGRAM CODE 301 | 10. REPORT NO. 004 |
|---|---|---|---|---|

**11. RELATED CASE NUMBERS:**

**12. COLLATERAL REQ:**

**13. TYPE OF REPORT:**
   MEMO OF INTERVIEW

**TOPIC:** INTERVIEW OF TED NEWMAN

**14. SYNOPSIS:**
On October 14, 2003, Jayne Mumbi NGATIA, a citizen and resident of the
Republic of Kenya, was arrested at O'Hare International Airport in Chicago
following the discovery of three packages containing heroin concealed in her
undergarments.  NGATIA was taken to a local hospital, where she passed 48
additional pellets containing heroin.  The approximate gross weight of the
heroin totaled 815.3 grams.

NGATIA stated to Customs and Border Protection (CBP) inspectors upon her
arrival in the United States that she would be staying with Virginia Newman in
▓▓▓▓▓▓▓ Illinois and that she would be involved in a fund-raising effort
on behalf of a school in Kenya.  NGATIA also stated that she was to speak at
Roosevelt University.  On October 28, 2003, agents of Immigration and Customs
Enforcement (ICE) interviewed Ted Newman at his office in Chicago.  This
report documents the information provided by Ted Newman.

| 15. DISTRIBUTION: RACOH SACCH | 16. SIGNATURE: MORISSETTE        SHARON         SENIOR SPEC AGENT |
|---|---|
| | 17. APPROVED: LAVOIE        NATHAN      S  OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: OH    O'HARE (CHICAGO) - R | 19. TELEPHONE: 847 635 6375 |
| | 20. TYPIST: MORISSETTE |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

GOVERNMENT
EXHIBIT

I

JN

0056

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1.  PAGE    3 |
|---|---|
| | 2.  CASE NUMBER OH13HI04OH0002 |
| | 3.  REPORT NUMBER: 004 |

during NGATIA's 2002 stay.  During that shopping trip, NGATIA asked to be dropped off at a Wal-Mart store alone.  She was to call Mrs. Newman's home when she was finished shopping.  NGATIA was dropped off in the afternoon. The Newmans had made plans with NGATIA for a family dinner at 6:00 p.m. Jayne NGATIA did not contact the family and ask to be picked up until after 7:00 p.m.  By that time, the family was very worried that something had happened to NGATIA.  No one asked NGATIA many questions about her absence. They were relieved that she was all right.

4. Virginia Newman told Ted Newman that Jayne NGATIA had requested a copy of Mrs. Newman's personal bank statement, but that it did not need to be a current statement.  NGATIA said it was needed to prove that Mrs. Newman could afford to have NGATIA visit.  Ted Newman was very disturbed by the request and explained to his mother that there were ways that unscrupulous individuals could use that information to access her account.

Ted Newman later provided copies of e-mail correspondence between NGATIA and Virginia Newman.  Prior to setting up a new home computer recently, Mrs. Newman had forwarded e-mails to her friend, Lois Richards, who in turn sent them to Ted Newman.  Mrs. Newman had previously given agents copies of those e-mails received since setting up the new computer.

The RAC O'Hare investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

111303                    TECS II - LIST OF RELATED RECORDS                PAGE   1
                                                                           TN007064
                       2 RECORDS ARE RELATED TO BASE RECORD
OH13HI04OH0002004   ROI  COH MORISSETTE          S 111303


P9D82361700COH       NGATIA        JAYNE      M B F 052872
     SC  SUBJECT OF CURRENT INVESTIGATION                    SUB-SOURCE

OH13HI04OH0002       CASE COH MORISSETTE      S 101403
         JAYNE NGATIA ET ALL

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE    1 |
| | 3. CASE NUMBER OH13HI04OH0002 |

**4. TITLE:** JAYNE NGATIA ET ALL

**5. CASE STATUS:**    INTERIM RPT

| 6. REPORT DATE<br>111803 | 7. DATE ASSIGNED<br>101403 | 8. CLASS<br>I | 9. PROGRAM CODE<br>301 | 10. REPORT NO.<br>005 |
|---|---|---|---|---|

**11. RELATED CASE NUMBERS:**

**12. COLLATERAL REQ:**

**13. TYPE OF REPORT:**
   MEMO OF INTERVIEW

TOPIC: JAYNE NGATIA INTERVIEW

**14. SYNOPSIS:**
On October 14, 2003, Jayne Mumbi NGATIA, a citizen and resident of the
Republic of Kenya, was arrested at O'Hare International Airport in Chicago
following the discovery of three packages containing heroin concealed in her
undergarments.  NGATIA was taken to a local hospital, where she passed 48
additional pellets containing heroin.  The approximate gross weight of the
heroin totaled 815.3 grams.

On November 4, 2003, Jayne NGATIA was interviewed at the offices of the United
States Attorney in Chicago, Illinois.  The interview was conducted without
proffer protection and was limited in scope to the single trip to the U. S.
during which NGATIA was arrested.  This report summarizes the statements made
by NGATIA on November 4, 2003.

| 15. DISTRIBUTION:<br>RACOH SACCH | 16. SIGNATURE:<br>MORISSETTE     SHARON          SENIOR SPEC AGENT |
|---|---|
| | 17. APPROVED:<br>STEWART       JAMES        F  SENIOR SPEC AGENT |
| | 18. ORIGIN OFFICE: OH<br>   O'HARE (CHICAGO) - R | 19. TELEPHONE: 847 635 6375 |
| | | 20. TYPIST: MORISSETTE |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

GOVERNMENT
EXHIBIT

J

JN                                                    0048

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    2 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 005 |

DETAILS OF INVESTIGATION:
On October 14, 2003, Jayne Mumbi NGATIA was arrested by Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) at O'Hare International Airport in Chicago.  NGATIA had arrived in the U. S. aboard British Airways flight 295 from Nairobi, Kenya via London, England.  NGATIA was found to have three packages which field-tested positive for heroin concealed in her undergarments.

NGATIA consented to a medical examination and ex-ray, which revealed the presence of additional foreign objects in NGATIA's body.  NGATIA was hospitalized for approximately three days, during which time she passed forty-eight pellets containing heroin, which had been ingested or inserted.

On November 4, 2003, NGATIA was interviewed at the offices of the U. S. Attorney in Chicago.  Present in addition to NGATIA were her attorney, Dan Hensler, Assistant U. S. Attorney (AUSA) James Barz, ICE Senior Special Agents Sharon Morissette and James Stewart, Drug Enforcement Administration (DEA) Special Agent Robert Fergus, Federal Bureau of Investigation (FBI) Special Agent Doug DePodesta, and Public Defender's Office Investigator Mike Medina.

AUSA Barz explained to NGATIA that any statements she made could be used against her.  NGATIA said that she understood.  The following is a non-verbatim summary of statements made by Jayne NGATIA on November 4, 2003.

1. NGATIA was approached at her office by two men, HAKEEM and HOLA (spelling unknown) in August or September of 2003.  NGATIA works in a travel agency. NGATIA knew HAKEEM and HOLA through a mutual friend, Susan NZIOKI, who had brought them to NGATIA's office to purchase tickets for travel.

2. HAKEEM and HOLA said they wanted to talk to NGATIA.  NGATIA made arrangements to meet them at a local fast food restaurant called Wimpy in Nairobi.  NGATIA was asked if she had a visa.  She told HAKEEM and HOLA that she did.  They told her that she could make some money if she did something for them.  NGATIA asked what they wanted her to do, but all they told her was that she would be happy with the money.  NGATIA did not stay at the restaurant long, because she had taken a short break from work to meet HAKEEM and HOLA and had to get back.

3. HAKEEM and HOLA gave NGATIA their phone numbers, which she wrote on a travel agency envelope.  HAKEEM's number is 0722595977 and HOLA's is 0722527732.  Also written on the same envelope are two telephone numbers for NGATIA's sister, Moyo Ngatia, in Kenya:  8331734 and 64211407929.

4. NGATIA telephoned HAKEEM on the weekend.  HAKEEM told NGATIA that he wanted to send her to bring something to the U. S., but he didn't say what that

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    3 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 005 |

was.

5. NGATIA telephoned HAKEEM a second time.  During that conversation, NGATIA insisted on knowing what it was she would be bringing to the U. S.  HAKEEM told NGATIA that it was drugs.  He didn't say what kind of drugs.  He said that it makes money in the U. S.

6. During the same conversation, NGATIA and HAKEEM "haggled" about the money NGATIA would be paid.  He told her that the amount depended on how much she carried.

7. NGATIA met with HAKEEM and HOLA a second time, approximately five to seven days before she was to travel.  They again met at the Wimpy restaurant.  At this meeting, NGATIA was given $1,200 USD for travel expenses.  She was also given a paper bag that contained the drugs, wrapped in flat packages.

8. HAKEEM and HOLA told NGATIA that there were a number of ways that she could carry the drugs.  They would put it in shoes for her or she could tape the packages to her body.  NGATIA was nervous about those ideas, so HAKEEM and HOLA suggested that she swallow the drugs.

9. HAKEEM made a call on his cell phone.  He had another man come to Wimpy to teach NGATIA how to swallow.

10. HAKEEM went outside and came back into the restaurant with some tablets.  NGATIA never saw who gave HAKEEM the tablets.

11. HAKEEM, HOLA, and NGATIA got into a dark grayish Japanese-made car, possibly a Toyota, bearing license plate KAD (or KAJ) 597 L (or J).  The car, a four-door, had leather seats and looked new, but the license plate indicates that the car is about two years old.  HAKEEM was driving.

12. HAKEEM drove to a kiosk, where he got water.  He then pulled into a parking area and gave NGATIA some black-wrapped pellets to swallow.  The pellets did not contain drugs.  They were to teach her how to swallow.

13. Still in the car, HAKEEM swallowed several pellets to show NGATIA how to do it.  NGATIA swallowed two or three pellets, but could not swallow any more.  HAKEEM told her that she could do it.  He told NGATIA to call him when she was ready to make the trip.

14. Two days later, HAKEEM called NGATIA.  He told her that he would call her again when they were ready for NGATIA to travel.

15. HAKEEM called NGATIA again on a Thursday.  He wanted her to travel on

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

JN

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    4 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 005 |

Friday.  NGATIA told HAKEEM that she could not go on Friday, but could make the trip on the following Monday.

16. On Monday morning at approximately 6:00 a.m., HAKEEM called NGATIA and told her to take some tablets to clean out her stomach.  HAKEEM said they would meet at 9:00 a.m.  NGATIA went to her office shortly before 11:00 a.m.  She called HAKEEM at about 11:00 a.m. and told him that she was ready.

17. NGATIA's flight was scheduled for 10:00 p.m.  She had booked the flight at her own office, Loreno Travel, but Loreno is not licensed to issue tickets.  The tickets were printed at Debonair Travel, Loreno's parent agency, and NGATIA picked them up Monday morning.

18. HAKEEM picked NGATIA up at her office.  HOLA was not with him.  HAKEEM drove to a house in an area of Nairobi called Buru Buru.  The house was about a ten-minute drive from NGATIA's office.  HAKEEM had keys to the ground floor of the house.  The house was a white 2-flat with a red roof and was located just beyond a property that had building materials outside with grass growing over them.

19. HAKEEM and NGATIA remained in the house from about 11:00 a.m. until about 7:00 p.m.  HAKEEM had sixty-five pellets for NGATIA to swallow.  NGATIA repeatedly attempted to swallow pellets, but kept vomiting.  She could not swallow all sixty-five, so HAKEEM re-wrapped some of the smaller pellets into larger packages for NGATIA to conceal on her body.

20. HAKEEM told NGATIA that he has a wife and a new baby.  NGATIA did not see any signs of children at the house, but the house did appear as if someone lived there.  The guard at the gate seemed to know HAKEEM and spoke to him.

21. During the day, HAKEEM spoke to several people on the phone.  He used only his cell phone.  HAKEEM is Nigerian and spoke only in his language during his telephone conversations.  NGATIA heard the names JIMMY, ID, and ABDULLAH in conversations HAKEEM had throughout the day.

22. One person HAKEEM had a conversation with has a brother in Nairobi.  This brother, a young boy, was arrested.  The person speaking with HAKEEM wanted HAKEEM to help his young brother.  HAKEEM talked about the call to NGATIA and did not seem eager to help the young boy.  NGATIA had the impression that the brother HAKEEM had spoken with was in the U. S. and that he was the person she would be meeting there.

23. HAKEEM told NGATIA that she would meet his brother in Chicago.  She did

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. PAGE    5 |
|---|---|
| R E P O R T  O F  I N V E S T I G A T I O N C O N T I N U A T I O N | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 005 |

not know if he meant blood brother or tribal brother.

24. HAKEEM said that someone would come up to NGATIA at the airport in Chicago and greet her in her language. HAKEEM told NGATIA not to change her clothes, as the person meeting her would have a description of her clothing. This individual would instruct NGATIA as to where she should go. Those instructions would be to take a taxi to a hotel in the downtown area.

25. HAKEEM told NGATIA that if no one met her, she should take a taxi to a hotel near downtown. HAKEEM specified clearly that it should be a hotel near downtown.

26. HAKEEM gave NGATIA a piece of paper with a telephone number on it, to be used if no one met her with instructions at the airport. HAKEEM then spoke with someone on the phone and confirmed that someone would be at the airport, so he took back the paper.

27. HAKEEM gave NGATIA a paper with a phone number on it, but took it back before she looked at it.

28. HAKEEM told NGATIA that she was carrying 500 grams and would be paid $5,000 USD. HAKEEM wrote the all amounts that NGATIA had on a piece of paper so he would be able to tell the person in Chicago what she should be paid. She saw that he wrote 47.

29. HAKEEM told NGATIA that if no one met her at the airport, she should go to a hotel and call HAKEEM. She should give HAKEEM the hotel telephone number and her room number. She should then get something to eat so the pellets would come out and wait in the hotel room for someone to contact her.

30. NGATIA described HAKEEM as very short, very black, and muscular. He appeared to be about forty years old. His name in her cell phone would be listed as HAK. HOLA would be HOL.

31. NGATIA knows a WALE in Chicago from a previous trip. He has no connection with the October 2003 trip. NGATIA believes that the name WALUS was misread from her telephone or her phone book in her office. WALUS would be the way she would write the name WALE in the U. S.

32. NGATIA does not know why HAKEEM and HOLA came to her to ask her to transport drugs. Nairobi is a small town and people know who has traveled to the U. S. There is a prestige associated with such travel.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

JN

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE     6 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 005 |

33. Susan NZIOKI never traveled to the U. S. before and never carried drugs. Susan NZIOKI and her sister, DOROTHY, were extradited to the U. S. earlier in 2003 to face drug trafficking charges. Dorothy NZIOKI is rich.

34. Susan NZIOKI brought many, many clients to NGATIA to buy tickets.

35. NGATIA agreed to smuggle drugs because she needed the money. She owes a shylock approximately 390,000 shillings at an interest rate of 30% per month.

36. NGATIA's friend in the Chicago area, Virginia Newman, supports a school in Kenya that rescues young girls from forced marriages and female circumcision. NGATIA has been trying to get sponsors for the school. Approximately two weeks before her travel, NGATIA visited the school. NGATIA has proposed on-camera interviews with the school's headmistress. NGATIA has also proposed that she herself would make fund-raising speeches. Mrs. Newman's son works for a college and NGATIA has suggested that she could make a presentation at the college.

37. Mrs. Newman wanted to return to Kenya and has the frequent flyer miles to do so. NGATIA planned on picking Mrs. Newman up in November 2003. NGATIA would stay at Mrs. Newman's home for about two weeks and then travel back to Kenya with Mrs. Newman. NGATIA would also escort Mrs. Newman to London, as Mrs. Newman was afraid she would get lost by herself.

38. NGATIA's visa expired in August. She went to the U. S. Embassy in Nairobi with her documents in order to apply for a renewal. NGATIA was told that her bank statement did not show sufficient funds for a trip to the U. S.

39. NGATIA was asked whom she would be visiting in the U. S. She was told that she would have to provide the embassy a copy of Mrs. Newman's bank statement to prove that Mrs. Newman could afford to host NGATIA for two weeks.

40. NGATIA asked Mrs. Newman to write a letter on her behalf and send a copy of her bank statement. NGATIA never said that it did not have to be a current statement. NGATIA also requested a letter of invitation from Christopher Newman.

41. NGATIA returned to the U. S. Embassy with those letters and a statement from British Airways that she had sufficient miles accumulated for the trip. She saw the same person at the embassy and showed her the documents. Additionally, NGATIA showed a more current statement from her own bank account. The woman at the embassy asked NGATIA why she had not shown that

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    7 |
|---|---|
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 005 |

statement to begin with. NGATIA explained that she had brought her August statement the first time, but had since received her September statement.

42. The woman who told NGATIA to get Mrs. Newman's bank statement was white, about forty years old, small, with long, light-colored hair. She was the only woman with long hair working in the embassy.

43. Susan NZIOKI brought many clients to NGATIA. Some paid in cash, some with checks. Some made installment payments for their tickets.

44. HAKEEM brought clients to NGATIA. They never had to show any identification, because they only took train trips.

45. Susan NZIOKI brought NGATIA perhaps five to ten clients.

46. Susan and Dorothy NZIOKI, who are Kenyan, lived near the State House in an area called Caledonia. Susan NZIOKI is slim and twenty-eight or twenty-nine years old. Dorothy NZIOKI is about forty.

47. NGATIA met an African woman named Abdulahi at the Metropolitan Correctional Center (MCC) when she arrived. NGATIA told Abdulahi about her arrest. Abdulahi told NGATIA that she knows ID.

48. NGATIA does not know ID. She has no phone number for him. She is not sure that ID is the individual who was to meet her. She assumed so, because she heard HAKEEM mention his name and JIMMY's.

The interview was interrupted at several points in order to allow NGATIA to speak privately with her attorney.

NGATIA drew a map to show the location and the route that HAKEEM drove to get to the house where he had her swallow heroin pellets. Additionally, NGATIA consented in writing to a search of her cellular telephone and all information accessible through the phone.

The RAC O'Hare investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

111803                    TECS II - LIST OF RELATED RECORDS                    PAGE   1
                                                                              TN007064
                              2 RECORDS ARE RELATED TO BASE RECORD
OH13HI04OH0002005      ROI   COH MORISSETTE        S 111803


P9D82361700COH        NGATIA        JAYNE        M  B  F  052872
       SC   SUBJECT OF CURRENT INVESTIGATION                    SUB-SOURCE

OH13HI04OH0002        CASE COH MORISSETTE        S 101403
         JAYNE NGATIA ET ALL

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY: HEGERICH, THOMAS S

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | 2. PAGE  1 |
| | 3. CASE NUMBER OH13HI04OH0002 |

4. TITLE: JAYNE NGATIA ET ALL

5. CASE STATUS:    INTERIM RPT

| 6. REPORT DATE 111303 | 7. DATE ASSIGNED 101403 | 8. CLASS I | 9. PROGRAM CODE 301 | 10. REPORT NO. 003 |
|---|---|---|---|---|

11. RELATED CASE NUMBERS:

12. COLLATERAL REQ:

13. TYPE OF REPORT:
   MEMO OF INTERVIEW

TOPIC: INTERVIEW OF KAFAYAT AMOO

14. SYNOPSIS:
On October 14, 2003, Jayne Mumbi NGATIA, a citizen and resident of the Republic of Kenya, was arrested at O'Hare International Airport in Chicago following the discovery of three packages containing heroin concealed in her undergarments.  NGATIA was taken to a local hospital, where she passed 48 additional pellets containing heroin.  The approximate gross weight of the heroin totaled 815.3 grams.

On October 28, 2003, Kafayat Amoo, an inmate at the Metropolitan Correctional Center (MCC) in Chicago, was interviewed at the offices of the United States Attorney in Chicago.  Amoo requested the meeting for the purpose of providing information about a number of matters.  This report documents information provided by Amoo regarding Jayne NGATIA.

| 15. DISTRIBUTION: RACOH SACCH | 16. SIGNATURE: MORISSETTE    SHARON         SENIOR SPEC AGENT |
|---|---|
| | 17. APPROVED: LAVOIE      NATHAN    S   OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: OH  O'HARE (CHICAGO) - R | 19. TELEPHONE: 847 635 6375 |
| | | 20. TYPIST: MORISSETTE |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

GOVERNMENT
EXHIBIT

K

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE    2 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 003 |

DETAILS OF INVESTIGATION:

On October 14, 2003, Jayne NGATIA was arrested after arriving in Chicago aboard British Airways flight 295 from Nairobi, Kenya via London, England. NGATIA, a citizen and resident of the Republic of Kenya, was discovered to be carrying three packages containing heroin in her undergarments. NGATIA consented to a medical examination and ex-ray, which revealed the presence of additional pellets of heroin inside her body. NGATIA was hospitalized from October 14 to October 17, 2003. During her hospitalization, she passed a total of 48 pellets, which had been ingested or inserted. Those pellets also contained heroin.

On October 28, 2003, Immigration and Customs Enforcement (ICE) agents interviewed Kafayat Amoo at the offices of the U. S. Attorney in Chicago. Also present were agents from the Drug Enforcement Administration, Amoo's attorney, and Assistant U. S. Attorney Michelle Collins. Amoo discussed a number of topics. Those statements that pertain to Jayne NGATIA are summarized as follows.

1. A week or more earlier, Amoo, an inmate at the MCC in Chicago, was contacted by a new inmate named JAYNE. JAYNE had been told by one of the female guards upon her arrival that there was another African woman (Amoo) and she should contact her.

2. JAYNE was very upset and was crying. Amoo asked JAYNE why she had been arrested and JAYNE told her that she had been caught with drugs. She had swallowed and hidden them on her body. She said she had not done it before.

3. NGATIA said that she had been given the drugs by a Nigerian, currently living in Kenya, named AKIN (spelling unknown). AKIN has an older brother, IDOWU, also called ID, living in Chicago. It was ID who was supposed to meet JAYNE in Chicago.

4. NGATIA asked Amoo to add ID to her telephone list at the MCC so that JAYNE could call him. She provided Amoo with the telephone number 773-263-0068. Amoo did not add ID to her phone list.

5. NGATIA said that ID lives in the area of Foster and Sheridan in Chicago. JAYNE thought the address is 4762 N. Foster, but wasn't sure. JAYNE said that she knows the building by sight. JAYNE thinks that ID's information is in her address book.

6. Amoo knows a Nigerian named AKIN with an older brother, ID, in Chicago. They are well known in Nigeria, as they have a lot of money. She asked JAYNE about friends of AKIN and ID in an attempt to determine whether she

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE   3 |
| --- | --- |
| | 2. CASE NUMBER OH13HI04OH0002 |
| | 3. REPORT NUMBER: 003 |

and JAYNE knew the same people.  Amoo is sure that the AKIN and ID that JAYNE talked about they are the same people Amoo knows from Nigeria.

7. JAYNE knows several of ID's friends:  WALE, SUNDAY, KUNLE, and PRINCE. Amoo also knows SUNDAY, KUNLE, and PRINCE, but does not know WALE. SUNDAY's telephone number is ▓▓▓▓▓▓▓▓▓.  KUNLE's telephone number is ▓▓▓▓▓▓▓▓▓▓▓▓▓  Amoo does not know PRINCE's telephone number, but described him as tall and fat, in his late 40s or early 50s.  ID is around 40 years old, tall, and dark.

8. JAYNE also asked Amoo to put a friend named Virginia on her phone list. She gave Amoo the telephone number ▓▓▓▓▓▓▓▓▓ for Virginia.  Amoo did not put Virginia on her phone list.

9. JAYNE said that she had been talking with another inmate, Abosede Abdulahi, who advised JAYNE not to cooperate with investigators.  Abdulahi told JAYNE that if she cooperated, she would be charged with conspiracy.  Abdulahi advised JAYNE that she would be much better off letting her case stand on its own.  Amoo told JAYNE that she should just tell everything that she knows, but JAYNE was undecided about what she was going to do.

The RAC O'Hare investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.