IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Blanche M. Manning |
| | ) | |
| V. | ) | Case No. 03 CR 1004 |
| | ) | |
| JAYNE NGATIA, | ) | |
| | ) | |
| Defendant. | ) | |

### SENTENCING ORDER

The case is before the court for sentencing. In October 2003 defendant Jayne Ngatia was arrested at O'Hare International Airport smuggling 691.9 grams of heroin, mostly in pellets she swallowed before leaving Kenya, her home. She pleaded guilty without a plea agreement to one count of importing heroin into the United States. *See* 21 U.S.C. § 952(a).

Under 21 U.S.C. 960(b)(2)(A), Jayne Ngatia[1] faces a mandatory minimum sentence of 5 years, a maximum sentence of 40 years, a minimum term of supervised release of 4 years, and is not eligible for probation. The United States Probation Office calculated a base offense level of 28 and criminal history category of I under the sentencing guidelines. In its presentence investigation report (PSR), the probation office calculated a total offense level of 36 after accounting for Jayne Ngatia's relevant conduct, which included the quantity of heroin smuggled by other Kenyan women allegedly at Jayne Ngatia's direction, and Jayne Ngatia's role as a leader in the heroin smuggling scheme. The sentencing range under the guidelines for Jayne Ngatia's offense level and criminal history category is 188 to 235 months' imprisonment.

---

[1]For the sake of clarity, the first names of Jayne Ngatia, Anne Njanja, and Millicent Njogu are used throughout this order.

Jayne Ngatia objects to the probation office's calculation on the grounds that she: (1) should not be sentenced for any amount of drugs other than the amount for which she was arrested and pleaded guilty; (2) was not a leader/organizer; and (3) should receive reductions for acceptance of responsibility and under the safety valve provisions. Jayne Ngatia also argues that relevant conduct must be proved beyond a reasonable doubt, and that it would be fundamentally unfair to sentence her based upon relevant conduct that includes the quantity of heroin smuggled by others, which is 7 times the amount of heroin she smuggled herself and increases her sentencing range four-fold.

**I.    FACTS**

The following facts are culled from Jayne Ngatia's plea declaration, as well as testimony at her sentencing hearing. Jayne Ngatia worked as a travel agent in Kenya. In October 2003, she embarked on a trip to the United States to smuggle heroin. Prior to boarding her plane in Kenya, Jayne Ngatia swallowed numerous pellets containing heroin. In addition, she taped a few pellets of heroin to her body under her clothing. In all, she smuggled 691.1 grams of heroin into the United States.

After receiving a tip from the FBI that Jayne Ngatia might be smuggling heroin, customs inspectors questioned her when she arrived at O'Hare. She denied that she was smuggling heroin and told inspectors that she was in Chicago to visit Virginia Newman, an American she had befriended in Kenya. But when inspectors called Newman, she denied expecting a visit from Jayne Ngatia. Inspectors subsequently searched Jayne Ngatia and found heroin on her person. Suspecting that she was smuggling additional heroin inside her, inspectors took her to a nearby hospital where they recovered additional heroin from her bowel movements.

Jayne Ngatia eventually admitted smuggling the heroin that inspectors found. But during an interview in November 2003 through which she hoped to qualify for a safety value reduction, Jayne Ngatia told special agent Sharon Morissette that she did not know to whom she was supposed to deliver the heroin, and denied being involved in any other heroin smuggling trips. Unbeknownst to Jayne Ngatia, however, Morissette had already spoken to Kayafaat Abimbola-Amoo, a Nigerian woman who met Jayne Ngatia while both were being held at the Metropolitan Correctional Center. Amoo recounted to Morissette a conversation she had with Jayne Ngatia. During that conversation, Jayne Ngatia told Amoo that she had received the heroin she smuggled from a man named Akin, and that she was to deliver the heroin to Akin's brother, Id, who lived in Chicago. Jayne Ngatia also gave Amoo Id's phone number and street address. Amoo told Morissette that she knows an Akin in Nigeria who has a brother Id in Chicago, and that the brothers were reputed drug dealers. Morissette testified about her conversation with Amoo at Jayne Ngatia's sentencing hearing, and the government introduced into evidence a proffer from Amoo that also described her conversation with Jayne Ngatia.

Although Jayne Ngatia denied any previous involvement in drug smuggling, the government contends that while in Kenya, Jayne Ngatia recruited and trained other Kenyan women to work as heroin couriers. At Jayne Ngatia's sentencing hearing, Anne Njanja testified that Jayne Ngatia recruited and trained her to smuggle heroin. According to Anne Njanja, she first met Jayne Ngatia in 2003, when Jayne Ngatia stopped by Anne Njanja's office and introduced herself as a travel agent. Anne Njanja later arranged travel through Jayne Ngatia, at which time Anne Njanja mentioned that she had a five-year VISA to the United States. Over time, Jayne Ngatia encouraged Anne Njanja to travel to the United States, culminating in a

meeting at a hotel during which Jayne Ngatia asked Anne Njanja to smuggle heroin to the U.S. During the meeting, Jayne Ngatia demonstrated how to swallow sample pellets of heroin and taught Anne Njanja how to swallow the pellets.

In August 2003, Jayne Ngatia gave Anne Njanja an unknown amount of pellets containing heroin to swallow. Jayne Ngatia also gave Anne Njanja a plane ticket to Newark, N.J., a destination address in Piscataway, NJ to declare on her customs form, and the address of a hotel in Detroit where she was to meet a man named Chris, to whom she was to hand over the pellets of heroin after expelling them. Anne Njanja successfully smuggled the drugs into the U.S., delivered them to Chris, and returned home.

During a second trip in May 2004 not arranged by Jayne Ngatia, Anne Njanja was arrested at an Atlanta airport smuggling 536 grams of heroin. She confessed to police, told them about her previous involvement with Jayne Ngatia, and positively identified Jayne Ngatia and Chris in photo lineups.

A second Kenyan woman also claims that Jayne Ngatia recruited her to make multiple heroin smuggling trips to the United States. Millicent Njogu stated in a proffer introduced into evidence at Jayne Ngatia's sentencing that she met Jayne Ngatia through a man who helped her obtain a passport. According to Millicent Njogu's proffer, Jayne Ngatia twice offered to buy her passport, but Millicent Njogu refused. Jayne Ngatia then suggested that Millicent Njogu accompany her to the United States to transport curios and souvenir items, but Millicent Njogu again refused. Eventually, though, Millicent Njogu agreed to transport pellets of drugs to the United States for Jayne Ngatia. Jayne Ngatia demonstrated for Millicent Njogu how to swallow the pellets and Millicent Njogu practiced with sample pellets.

According to the proffer, in May 2002 Jayne Ngatia gave Millicent Njogu 63 pellets containing heroin to swallow, along with a plane ticket to Detroit, a destination address in Boston to declare on her customs form, and the address of a hotel where she was to meet someone to hand over the pellets of heroin after expelling them. After Millicent Njogu arrived in the United States, Jayne Ngatia directed Millicent Njogu to go to her hotel and meet a man carrying a bag of food from McDonald's. The man was named Chris. After successfully delivering the drugs to Chris, Millicent Njogu returned home.

In her proffer, Millicent Njogu claims that she smuggled drugs into the United States four more times for Jayne Ngatia. In each case, Jayne Ngatia gave her the drugs, airlines tickets, addresses to use on her customs form, and addresses where to drop off the drugs. On each occasion she delivered the drugs to Chris, except during one trip to Chicago when she gave the drugs to a man named Id.

In November 2003 Millicent Njogu was caught smuggling heroin and arrested at JFK airport in New York on a trip that Jayne Ngatia did not arrange. During a search of her belongings, customs agents found what appeared to be a promissory note from Jayne Ngatia to Millicent Njogu signed by both in the amount of 5000 Kenyan schillings. Millicent Njogu confessed to agents, told them about her previous involvement with Jayne Ngatia, and positively identified both Jayne Ngatia and Chris in a photo lineup.

The government also contends that Jayne Ngatia herself smuggled heroin into the United States six times prior to the time she was caught. In support, customs special agent Sharon Morissette testified that on four of those trips, Jayne Ngatia gave destination addresses on her customs form that Millicent Njogu had given on some of her customs forms. On another trip, she spent several nights in the home of Virginia Newman, who also testified at Jayne Ngatia's

sentencing. According to Newman, Jayne Ngatia asked to be dropped off at a Wal-Mart to shop. Newman began to worry about Jayne Ngatia when she failed to call to be picked up a short time later as expected. Jayne Ngatia eventually called to be picked up at Wal-Mart four hours after being dropped off. Newman found it strange that after such a long time shopping, Jayne Ngatia bought only a suitcase.

**II.     Relevant Conduct**

Section 1B1.3(a)(2) of the sentencing guidelines call for an increase in the defendant's base offense level to account for all "relevant conduct," which includes "all acts and omissions" committed by the defendant that are "part of the *same course of conduct* or *common scheme or plan* as the offense of conviction." (Emphasis added.) This "related conduct" or "aggregation rule" requires that the sentencing court "consider quantities of drugs not specified in the counts of conviction," *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998), and even permits the court to consider "related conduct, whether it [was] charged or not." *United States v. Petty,* 132 F.3d 373, 381 (7th Cir. 1997). The rule also allows courts to consider drug transactions which predated the transactions for which the defendant was convicted. *United States v. Zehm*, 217 F.3d 506, 512 (7th Cir. 2000).

However, "[t]he mere fact that the defendant has engaged in other drug transactions is not sufficient [by itself] to justify treating those transactions as 'relevant conduct' for sentencing purposes." *United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996). To ensure that the aggregation rule is not abused, the government must demonstrate a nexus between the convicted and un-convicted activities by showing that the offenses were: (1) "part of the same course of conduct"; or (2) part of a "common scheme or plan." *Zehm*, 217 F.3d at 511 (quoting section 1B1.3). Offenses that are part of the "same course of conduct" must be "sufficiently connected

or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3(a)(2), cmt. (n.9). In determining whether offenses are part of the "same course of conduct," a court should consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." Application Note 9 to Section 1B1.3. In the absence of one of these factors, the government must show a "stronger presence of at least one of the other factors." *Id.*

Although not necessarily dispositive, "temporal proximity is a significant consideration," and courts must "be cautious and exacting" in permitting "stale dealings" to constitute the same course of conduct. *United States v. Cedano-Rojas*, 999 F.2d 1175, 1180 (7th Cir. 1993) (finding a two year lapse between transactions constituted a lack of temporal proximity). *See also United States v. Johnson*, 324 F.3d 875, 879 (7th Cir. 2003) (finding "lack[] of temporal proximity" where 1½ years separated the two criminal episodes).

### A. Proper Standard

Jayne Ngatia contends that this Court must apply the "beyond a reasonable doubt" standard to determine relevant conduct. The government disagrees and advocates the preponderance of the evidence standard, which it contends is still intact even after *Booker*.

The Seventh Circuit has squarely addressed the issue of the proper standard to use when determining relevant conduct *post-Booker*. In *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005), the Seventh Circuit held that under *Booker*, "sentencing factors will continue to be made by judges, on the preponderance of the evidence."

Nevertheless, Jayne Ngatia argues that the government should be held to a higher standard in her case because including as relevant conduct the heroin Anne Njanja and Millicent Njogu smuggled would increase her sentencing range four-fold. The Seventh Circuit has agreed

that "due process considerations may, at some point, require a greater showing for a dramatic increase" in a defendant's sentencing range. *United States v. Johnson*, 342 F.3d 731, 736 (7th Cir. 2003). But it has also applied the preponderance standard to cases involving even more dramatic enhancements to a defendant's sentencing range than the four-fold increase to Jayne Ngatia's. *See, e.g., United States v. Rodriguez*, 67 F.3d 1312, 1323 (7th Cir. 1995) (enhancement from 51-63 months to life imprisonment); *United States v. Masters*, 978 F.2d 281, 286-87 (7th Cir. 1992) (enhancement from 33-41 month range to 137-month range).

Accordingly, the preponderance of the evidence standard, rather than the beyond a reasonable doubt or clear and convincing evidence standard, applies when determining sentencing facts.

    **B.**    **Drug Quantity**

The government and PSR differ in their use of relevant conduct to calculate Jayne Ngatia's drug quantity, and as a result arrive at different total drug quantities. However, because both total quantities fall within the same range—a drug quantity of more than 3 but less than 10 kilograms of heroin—Jayne Ngatia's offense level for her relevant conduct is 34 under either calculation. *See* U.S.S.G. § 2D1.1(c)(3).

According to the government's calculation, Jayne Ngatia's drug quantity should be based upon the following conduct:

    (1)    Jayne Ngatia's October 2003 trip when she was arrested;

    (2)    Jayne Ngatia's previous six trips;

    (3)    Anne Njanja's single trip arranged by Jayne Ngatia in August 2003;

    (4)    Millicent Njogu's five trips arranged by Jayne Ngatia during the period May 2002 to September 2003.

8

The total number of trips equals 13. The government estimates the amount of heroin smuggled during each trip to be .7 kilograms, based upon the amount carried by Jayne Ngatia when she was arrested (.691 kilograms) as well as the amount Millicent Njogu admitted smuggling during each of her five trips (.7 kilograms). *See United States v. Brumfield*, 301 F.3d 724, 734 (7th Cir. 2002) ("estimates of drug quantity are acceptable if they are based on evidence possessing a sufficient indicia of reliability") (internal quotations and citation omitted); *United States v. Noble*, 299 F.3d 907, 911 (7th Cir. 2002) ("A judge has leeway to extrapolate quantities from witnesses' statements of minimum sales . . . ") Accordingly, the total drug quantity equals 13 x .7, or 9.1 kilograms.

    The PSR's calculation is based upon the following :

    (1)    Jayne Ngatia's October 2003 trip when she was arrested; and

    (2)    Millicent Njogu's November 2003 trip when she was arrested, as well as five prior trips during the period May 2002 to September 2003.

The PSR attributes .7 kilograms to Jayne Ngatia and to each of Millicent Njogu's five trips during the period May 2002 to September 2003. But it also includes the 1.3 kilograms of heroin she smuggled in November 2003 when arrested, when in fact Jayne Ngatia did not arrange that trip. By including the 1.3 kilograms of heroin in its calculation, the PSR calculated a total drug quantity of .7 kg + 1.3 kg + (.7 kg x 5), which the PSR claims equals 5.4 kilograms (it actually equals 5.5 kg). Omitting the 1.3 kilograms of heroin results in a total drug quantity of 4.2 kilograms.

    The PSR recommends not including in the calculation any amount of heroin previously smuggled by Jayne Ngatia because there is no independent evidence of the quantity. The PSR never mentions the smuggling trip arranged by Jayne Ngatia for Anne Njanja, and the amount Anne Njanja smuggled is not included in the PSR's calculation.

9

### 1. Anne Njanja & Millicent Njogu Trips Arranged by Jayne Ngatia Are Relevant Conduct

Jayne Ngatia argues against including in her drug quantity calculation the estimated amount of drugs carried by Anne Njanja and Millicent Njogu during the trips Jayne Ngatia allegedly arranged. The only argument Jayne Ngatia offers in her objections to the PSR is that no evidence connects these women's trips, and therefore the government has not established that the trips were part of the same course of conduct, or part of a common scheme or plan. But, in fact, many facts were elicited during Jayne Ngatia's sentencing hearing establishing that their trips were all part of the same course of conduct, and part of the same scheme or plan to smuggle heroin into the United States, including evidence that:

- Jayne Ngatia recruited both Anne Njanja and Millicent Njogu to smuggle heroin;

- Jayne Ngatia trained both Anne Njanja and Millicent Njogu on how to swallow pellets used to smuggle drugs;

- Jayne Ngatia gave Anne Njanja and Millicent Njogu the pellets containing heroin that they swallowed and smuggled;

- Jayne Ngatia provided the airline tickets for Anne Njanja and Millicent Njogu's trips;

- Jayne Ngatia gave Anne Njanja and Millicent Njogu the destination addresses they declared on their customs forms;

- On two occasions, Jayne Ngatia used the same destination address that Millicent Njogu had previously used; on another occasion Millicent Njogu used the same destination address that Anne Njanja had previously used;

- Jayne Ngatia gave Anne Njanja and Millicent Njogu directions to the place where they were to hand over the heroin they smuggled;

- On all but one occasion, a man named Chris picked up the heroin; and

- Jayne Ngatia admitted to Millicent Njogu that she smuggled heroin herself and had recruited women in addition to Millicent Njogu to smuggle heroin.

The proximity of the trips also supports the conclusion that they were part of the same scheme or plan. The trips arranged by Jayne Ngatia for Anne Njanja and Millicent Njogu all occurred within the period May 2002 to September 2003. Gaps of 1½ or two years may call into question whether the conduct is sufficiently related, but these trips all occurred over a 1½-year period and are therefore sufficiently proximate. *See Johnson*, 324 F.3d at 879 (1½-year lapse between criminal episodes constituted a lack of temporal proximity); *Cedano-Rojas*, 999 F.2d at 1180 (two-year lapse between transactions constituted lack of temporal proximity).

Jayne Ngatia argues that even if her smuggling trip was part of the same course of conduct or scheme or plan, the amount of heroin smuggled by Anne Njanja and Millicent Njogu should not be included as relevant conduct because of the four-fold effect it has on her sentencing range.

### 2. Jayne Ngatia's Prior Trips Are Not Relevant Conduct

The government offered scant evidence that Jayne Ngatia's prior trips involved drug smuggling. Chief among the government's evidence is that on four occasions, Jayne Ngatia used some of the same destination addresses on her customs forms that Millicent Njogu had declared on her customs form while smuggling drugs. The government contends that because Millicent Njogu used those addresses while smuggling drugs, Jayne Ngatia necessarily was smuggling drugs when she used the same addresses. But such a conclusion is tenuous. The common use of destination addresses establishes only that Jayne Ngatia and Millicent Njogu were somehow connected, not that each use signaled drug smuggling. On balance, the court cannot conclude that the government's evidence of common use of destination address outweighs Jayne Ngatia's denial that the trips involved drugs.

11

The government also attempts to establish that Jayne Ngatia's January 2002 trip to the United States involved heroin smuggling using evidence from her host, Virginia Newman, that Jayne Ngatia shopped at Wal-Mart for four hours and bought only a suitcase. The government infers that Jayne Ngatia was not actually shopping the entire four hours, but rather was delivering smuggled drugs. But no other evidence supports such an inference. Furthermore, delivering drugs is not the only plausible explanation for Jayne Ngatia's extended absence.

On balance the court finds that the government has established by a prepondernace of the evidence that the quantity of heroin smuggled by Anne Njanja and Millicent Njogu during six trips Jayne Ngatia arranged are relevant conduct as well as Jayne Ngatia's own smuggling trip, but the government failed to establish that any of Jayne Ngatia's prior trips involved smuggling heroin. Accordingly, the drug calculations proposed by the government and PSR should be revised downward as follows:

$$7 \text{ trips} \times .7 \text{ kilograms} = 4.9 \text{ kilograms of heroin}$$

But because the revised drug quantity still falls between 3 and 10 kilograms of heroin, the offense level of 34 proposed by the government and PSR, and the sentencing range of 188-235 months' incarceration, is unaffected.

### III. Leadership Enhancement

Jayne Ngatia objects to two-level enhancement recommended in the PSR. Under U.S.S.G. § 3B1.1(c), a defendant's offense level should be increased by 2 levels if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity."

Jayne Ngatia essentially argues that no evidence supports the enhancement. However, as detailed above, the government has offered ample evidence that Jayne Ngatia served as a leader

12

in this common scheme to smuggle heroin into the United States. The evidence includes the following:

- Jayne Ngatia recruited both Anne Njanja and Millicent Njogu to smuggle heroin;

- Jayne Ngatia trained both Anne Njanja and Millicent Njogu on how to swallow pellets containing heroin;

- Jayne Ngatia gave Anne Njanja and Millicent Njogu the pellets containing heroin that they swallowed and smuggled;

- Jayne Ngatia provided the airline tickets for Anne Njanja and Millicent Njogu's trips;

- Jayne Ngatia gave Anne Njanja and Millicent Njogu the destination addresses they declared on their customs forms;

- Jayne Ngatia gave Anne Njanja and Millicent Njogu directions to the place where they were to hand over the heroin they smuggled;

- Jayne Ngatia admitted to Millicent Njogu that she had recruited women in addition to Millicent Njogu to smuggle heroin.

Accordingly, the government has established by a preponderance of the evidence that Jayne Ngatia served as a leader in smuggling heroin into the United States, and the two-level leadership enhancement should be assessed.

**IV.    Acceptance of Responsibility**

As previously discussed, prior to her arrest the FBI received a tip that Jayne Ngatia would arrive in the United States smuggling heroin. Jayne Ngatia initially denied to a customs inspector that she was smuggling drugs and stated that she was in Chicago to visit Virginia Newman. Only after inspectors found the drugs did she admit that she was smuggling heroin, but she still denied she knew to whom she was to deliver the heroin pellets, or that she recruited other couriers or was in any other way involved in other instances of heroin smuggling. Based upon Jayne

Ngatia's failure to provide all relevant information and admit relevant conduct, the government contends that she is not entitled to credit for acceptance of responsibility.

Under U.S.S.G. § 3E1.1(a), "[i]f the defendant clearly demonstrates acceptance of responsibility of his offense," the court should decrease the offense level by two levels. A defendant, however, is not automatically entitled to a departure for simply pleading guilty and bears the burden of demonstrating his acceptance of responsibility to be entitled to a reduction. *United States v. Camargo,* 908 F.2d 179, 185 (7th Cir.1990). In determining whether a defendant has properly accepted responsibility under subsection (a), courts look to the following factors set forth in Application Note 1 to section 3E1.1:

> (a) truthfully admitting the conduct comprising the offense(s) of conviction and admitting or not falsely denying any additional relevant conduct for which defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction . . . . A defendant may remain in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction . . . . However, a defendant who falsely denies, or frivolously contests, relevant conduct that the Court determines to be true has acted in a manner inconsistent with acceptance of responsibility;
>
> . . .
>
> (g) post-offense rehabilitative efforts (*e.g.*, counseling or drug treatment); and
>
> (h) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

*See United States v. Sullivan,* 916 F.2d 417, 420-421 (7th Cir.1990).

The government and PSR contend that other than pleading guilty to the 691 grams, Jayne Ngatia has not been completely truthful and in fact lied to the government regarding her knowledge of the scheme to import heroin from Kenya. The lies identified in the PSR and by the government include the following:

14

- Jayne Ngatia made false statements upon her arrest, including:

  ▸ claiming that she traveled to Chicago to visit a woman who, in fact, was not expecting her; and

  ▸ denying that she was importing drugs

- Jayne Ngatia subsequently made false statements while being interviewed by the government with her attorney present, including:

  ▸ denying that she had previously been involved in smuggling drugs into the United States; and

  ▸ denying that she knew to whom she was supposed to deliver the drugs she smuggled

At sentencing, Jayne Ngatia's attorney questioned the credibility of Amoo, who in a proffer claimed that Ngatia in fact knew to whom she was supposed to deliver the heroin she smuggled. Jayne Ngatia's counsel elicited from special agent Morissette that Amoo cooperated with the government hoping to receive a lighter sentence in her own heroin smuggling case. Therefore, according to Jayne Ngatia's attorney, Amoo had an incentive to provide information to the government that it could use against Jayne Ngatia, specifically that Jayne Ngatia knew to whom she was supposed to deliver her heroin.

Amoo's statement that Jayne Ngatia knew she was supposed to deliver her heroin to Id appears credible. Millicent Njogu also identified Id to investigators when she described delivering heroin to him during a trip to Chicago. Although special agent Morissette's testimony about what Amoo told her is hearsay, hearsay remains admissible in sentencing proceedings post-*Booker*, as long as the information has "'sufficient indicia of reliability.'" *See United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005) (quoting U.S.S.G. § 6A1.3(a)). Because Id's involvement in the heroin smuggling operation

15

headed by Jayne Ngatia was independently confirmed by Millicent Njogu, the court finds Amoo's statement to be reliable and admissible. *See id.*

Accordingly, because Jayne Ngatia was not forthcoming and provided false statements to investigators, she is not entitled to a two-level reduction for acceptance of responsibility.

**V.     Safety Valve Reduction**

Defendants may qualify for a two-level reduction under the "safety valve" provision of the Sentencing guidelines if they meet the following five criteria:

(1)     the defendant does not have more than one criminal history point;

(2)     the defendant did not use violence or credible threats or violence or possess a firearm or other dangerous weapon in connection with the offense;

(3)     the offense did not result in death or serious bodily injury;

(4)     the defendant was not an organizer, leader, manager or supervisor of others in the offense and was not engaged in a continuing criminal enterprise; and

(5)     the defendant has truthfully provided to the government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or a common scheme or plan.

U.S.S.G. § 5C1.2.

Jayne Ngatia does not qualify for a safety valve reduction for two reasons. First, as discussed above, Jayne Ngatia was an organizer, leader, manager or supervisor of others smuggling heroin into the United States, and therefore does not qualify for safety valve relief under criteria 4. Further, as also discussed above, Jayne Ngatia has was not truthful and in fact lied to the government regarding her knowledge of the scheme to import heroin from Kenya, and therefore does not qualify under criteria 5.

**VI. 28 U.S.C. § 3553 Factors**

Although under the U.S. Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005) the sentencing guidelines are now only advisory, courts must still look to them for guidance in choosing an appropriate sentence. *United States v. Baretz*, 411 F.3d 867, 877 (7th Cir. 2005). However, 28 U.S.C. § 3553 also directs courts to fashion a sentence that is reasonable and is not greater than necessary to comply with the purposes of sentencing. 18 U.S.C. § 3553(a). These purposes include: (A) reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment; (B) affording adequate deterrence to criminal conduct; (C) protecting the public from further crimes of the defendant; and (D) providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

In determining the particular sentence to be imposed, the court must consider not only the purposes of sentencing, but also several other factors including: (1) the nature and characteristics of the offense; (2) the defendant's history and characteristics; (3) the kinds of sentences available; (4) the sentencing range under the sentencing guidelines; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution. 18 U.S.C. § 3553(a)(1)-(7).

The nature of Jayne Ngatia's offense favors a significant period of incarceration. Drugs are a scourge on society, and the effects of heroin trafficking can be especially devastating. Congress set forth stiff penalties for criminal who traffic in heroin, both to punish them for their own behavior and to deter others from engaging in it.

17

Nevertheless, the court is not at liberty to ignore other sentencing factors which counsel against the sentencing range provided under the guidelines. These factors include Jayne Ngatia's conduct since her offense. *See United States v. Gee*, 226 F.3d 885, 900-02 (7th Cir. 2000) (district court in its discretion may grant a downward departure based upon defendant's post-conviction conduct demonstrating acceptance of responsibility); *see also United States v. DeShon*, 183 F.3d 888, 890-91 (8th Cir. 1999) (district court in its discretion may grant a downward departure based upon defendant's post-offense rehabilitation efforts).

By all accounts, Jayne Ngatia is working diligently toward rehabilitation. She has earned numerous certificates of achievement while incarcerated. According to the certificates, she has spent dozens of hours learning Spanish and parenting skills, and has attended multiple victim impact panels including one focusing on the damaging effects of drugs on society.

The court also finds enlightening a letter written on Jayne Ngatia's behalf by a former inmate who knew Jayne Ngatia at MCC, and who was previously sentenced by this court. In the letter, the former inmate recounts the "profound regret and shame" Jayne Ngatia expressed at resorting to crime to help her fledgling travel agency and to lift her family out of poverty.

In her own letter to the court, Jayne Ngatia admits her behavior amounted to "greed and foolishness." Significantly, she states that she now understands the "devastation drugs have done to people's lives," and that while at MCC she has encountered addicts whose "wrenching noises in the night haunted me, as I know I was willing to add to their addiction."

The court has also reviewed numerous other letters from friends and family attesting to Jayne Ngatia's good character. The letters describe Jayne Ngatia as hard-working, responsible, ambitious, loyal and, according to her mother, the "backbone of our family." Jayne Ngatia helped raise her younger sisters, and was the family breadwinner when her mother was too ill to work. A cousin believes that Jayne Ngatia was drawn into drug smuggling by the "wrong company of friends" coupled with "false promises of quick cash."

**VII. Sentence**

On balance, the court concludes that a sentence of 84 months is appropriate in this case. Jayne Ngatia's involvement in drug smuggling is reprehensible. But she has demonstrated a commitment to rehabilitation, and the court believes that it is possible for her to succeed in this endeavor. The court therefore believes that a sentence roughly half the minimum set forth in the sentencing guidelines correctly balances the severity of Jayne Ngatia's crime against her history and character, and the steps she continues taking towards rehabilitation.

ENTER:

DATE: October 14, 2005

Blanche M. Manning
United States District Judge

19